**Joanne FLYNN, Plaintiff,**

v.

**GOLDMAN, SACHS & CO., Defendant.**

**No. 91 Civ. 0035 (KMW).**

United States District Court, S.D. New York.

Nov. 8, 1993.

Steven J. Hyman, Janet C. Neschis, Paul H. Levinson, New York City, for plaintiff.

John F. Cannon, Theodore O. Rogers, Jr., Robin D. Fessel, Sullivan & Cromwell, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KIMBA M. WOOD, District Justice.

Joanne Flynn claims that her former employer, Goldman, Sachs & Co., discriminated against her because of her sex by

(1) failing to promote her to the position of Manager of Training and Development;

(2) failing to name her to the position of Manager of Sales Training as of December 13, 1988;

(3) terminating her; and

(4) giving her a severance package inferior to that of similarly situated male employees,

in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the New York Human Rights Law ("NYHRL"), N.Y.Exec.L. § 296.[1] The state law claims were tried before a jury from October 7, 1993 through October 25, 1993; the Title VII claims were tried simultaneously, before the court. At the close of all the evidence, Goldman Sachs moved for judgment as a matter

---

1. Prior to submitting the case to the jury, plaintiff withdrew her claims under the Equal Pay Act, 29 U.S.C. § 206(d), and the New York State Human Rights Law, N.Y.Exec.L.Sec. 296, that she was paid less as Acting Manager than the man she replaced because of her sex.

of law with respect to the claims to be decided by the jury pursuant to Fed.R.Civ.P. 50(a). The court reserved ruling on the motion at that time. Following the jury's verdict in favor of Ms. Flynn on the liability portion of all four state law claims, Goldman Sachs renewed its motion for judgment as a matter of law pursuant to Rule 50(b).[2] In the alternative, Goldman Sachs moved for a new trial pursuant to Fed.R.Civ.P. 59 on the ground that the verdict is against the weight of the evidence. For the following reasons, the court grants the motion for judgment as a matter of law and, in the alternative, grants the motion for a new trial.

## I. Motion for Judgment as a Matter of Law

### A. Legal Standard

▆▆▆▆ Fed.R.Civ.P. 50(a)(1) states the standard for granting a motion for judgment as a matter of law:

> If during a trial by jury a party has been fully heard with respect to an issue and **there is no legally sufficient evidentiary basis for a reasonable jury to have found for the party with respect to that issue,** the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue.

(emphasis added). In this circuit, such a motion may be granted only where "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture" or if the evidence is "so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *Lambert v. Genesee Hospital,* 10 F.3d 46, 56 (2d Cir.1993). In deciding a motion under Rule 50, made either before the verdict or after, the court may not weigh the evidence or pass on the credibility of witnesses, where credibility is at issue. Instead, the court must view the evidence most

favorably to the party against whom the motion is made and give that party the benefit of all legitimate inferences that may be drawn from the evidence. *See Samuels v. Air Transport Local 504,* 992 F.2d 12, 14, 16 (2d Cir.1993). However, the party bearing the burden of proof cannot create an issue for the jury's resolution by relying solely on the hope that the jury will not trust the credibility of the witnesses. " 'If all the witnesses deny that an event essential to plaintiff's case occurred, she cannot get to the jury simply because the jury might disbelieve these denials. There must be some affirmative evidence that the event occurred.' " *See Martin v. Citibank,* 762 F.2d 212, 217 (2d Cir.1985), *quoting* Wright & Miller, § 2527 at 563. *See also Love v. King,* 784 F.2d 708, 711 (5th Cir.1986) (in view of the unimpeached testimony of defendant denying plaintiff's claim and "in view of the complete lack of any other direct evidence of a conspiracy, it is simply too speculative to draw an inference of conspiracy from the facts of this case").

### B. Ms. Flynn's Theory of the Case

The theory of Ms. Flynn's case is that she was the lead candidate for the position of permanent Manager of Training and Development at Goldman Sachs prior to the time that she terminated a male subordinate named Edward Verlander on July 14, 1988. This termination, Ms. Flynn claims, caused Goldman Sachs (1) not to promote Ms. Flynn to the permanent position of Manager, (2) not to name Ms. Flynn Manager of Sales Training, (3) to terminate Ms. Flynn, and (4) to offer her a severance package inferior to those offered to similarly situated males. Tr. 2556, 2567–70. Ms. Flynn asserts that her sex actually played a role in each of these adverse employment decisions and had a determinative influence on their outcome. *See Hazen Paper Co. v. Biggins,* —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993). In support of this assertion, Ms. Flynn argues that a jury could reasonably find that Goldman Sachs decided not to promote her to the Manager position on July 25, 1988 because Goldman Sachs found her ter-

---

**2.** Prior to the start of trial, the court ordered a bifurcated trial. The jury's verdict was solely with respect to liability.

mination of Mr. Verlander objectionable in that she overstepped the line of aggressive behavior that it tolerated from its female professionals. Tr. 2556. Ms. Flynn characterizes the Verlander termination as the "linchpin" of her case and claims it supports the inference that Goldman Sachs had a sex-based motive for every adverse personnel decision Goldman Sachs made thereafter concerning her, including terminating her. Levinson Oct. 29, 1993 Letter at 6. She claims that to accomplish her termination, Goldman Sachs hired Doris Smith as Manager because either (1) it knew in advance that there existed a hostility between Ms. Smith and Ms. Flynn that would cause Ms. Smith to fire Ms. Flynn, or (2) once Ms. Smith was selected, Goldman Sachs learned of this hostility and accepted Ms. Smith's recommendations not to name Ms. Flynn to the position of Manager of Sales Training as of December 13, 1988 and to terminate her on March 7, 1989.

The court's function at this stage is to assess whether there is evidence in the record to support the jury's finding that Ms. Flynn's sex actually played a role in each of these decisions.

### C. Evidence in the Light Most Favorable to Ms. Flynn

The relevant events in this case, viewed in the light most favorable to Ms. Flynn, are as follows. Ms. Flynn joined Goldman Sachs as a Personnel Associate in 1980 in the recruitment section of the Personnel Department and was thereafter promoted to Assistant Manager in the Management Training and Development Department within the Personnel Department. Tr. 172–73, 278.[3] In December of 1987, Denny Scott, then head of Personnel, asked Ms. Flynn to take over the position of Acting Manager of the Department following the abrupt departure of the

Manager, Peter Mathias. In late January or early February 1988, Mr. Scott began a search for a permanent Manager for the Training and Development Department. Tr. 1905. Mr. Scott commenced an internal search and then an external search for candidates for the Manager position. *Id.* As part of a search for internal candidates, Mr. Scott solicited the views of partners, including the views of Nicola Caporale. Tr. 1981–20. To assist Goldman Sachs in identifying qualified external candidates, in early March 1988 Mr. Scott retained the outside consulting firm of Handy Associates to identify and evaluate external candidates for the position. Tr. 1906. Some time between February and April 1988, Mr. Caporale told Mr. Scott that Ms. Flynn was too self-promoting, and stated that she was a "worse character" than Peter Mathias. Tr. 1922–23; 2159.

On April 19, 1988, in a memorandum to Jonathan Cohen, the partner at Goldman Sachs who was in charge of the Personnel Department, Mr. Scott praised Ms. Flynn's performance as Acting Manager, when he nominated Ms. Flynn for the position of vice president. Mr. Scott commended Ms. Flynn for her "excellent leadership" in reestablishing the self esteem of her staff and in assuring that training programs were being delivered as scheduled. Ex. 31. Ms. Flynn expressed an interest in being considered for the permanent position at some time prior to the end of April 1988.[4]

#### 1. The Genesis of Ms. Flynn's Candidacy

On April 28, 1988, Mr. Scott told James Clovis of Handy Associates that Ms. Flynn had done a "terrific job as acting director of the department," had an outstanding attitude, and he asked Mr. Clovis to interview her and evaluate her candidacy. Ex. CG.

---

3. Ms. Flynn's total compensation increased each year from 1982 through 1988, as shown below:

| | |
|---|---|
| 1982 | $ 35,050 |
| 1983 | 44,680 |
| 1984 | 57,400 |
| 1985 | 83,000 |
| 1986 | 95,000 |
| 1987 | 110,000 |
| 1988 | 180,944 |

Ex. 77.

4. It is uncontested that Goldman Sachs began to act on Ms. Flynn's candidacy in early May, and that she was the first candidate interviewed for the position by Goldman Sachs partners. Ms. Flynn claims she first expressed an interest in the position in December 1987 (rather than in April 1988, when Mr. Scott claims to have first heard of her interest). Tr. 317, 618–22. In any event, Ms. Flynn has not argued that she was considered too late.

Mr. Clovis interviewed Ms. Flynn on May 5, 1988. Following that interview, Mr. Clovis noted that Ms. Flynn's familiarity with training and development at Goldman Sachs was an advantage, but that she also had the disadvantage that "she is very limited in other cultures and environments and styles of management that would help her focus on 'the best course of action' based on experience." Ex. CE. Mr. Clovis called Mr. Scott on May 9, 1988 to discuss Mr. Clovis's May 5 interview of Ms. Flynn. Mr. Clovis recorded that, in that call, in the course of discussing the pluses and minuses of Ms. Flynn's candidacy, Mr. Scott told him that Ms. Flynn had at least one dissenter, referring to Nicola Caporale, but that Mr. Scott believed if he were to approach Mr. Caporale, Mr. Caporale would agree to give Ms. Flynn an opportunity to be the permanent Manager. Ex. CF. Mr. Scott also expressed to Mr. Clovis some reservations about Ms. Flynn's limited managerial experience, specifically, as recorded in Mr. Clovis's notes: "there is the strong evidence that she really has no management skills other than what she has picked up along the way.... Therefore, while she is very capable, she does not bring the credentials that [Mr. Scott] feels are necessary." *Id.* The note ends with the statement: "Good exchange and we both agreed that quality in this field of management development and training is in very, very short supply." *Id.* On June 27, 1988, Mr. Clovis recorded Mr. Scott's comment to him that day that Ms. Flynn was doing a "superb job, rising to the occasions as required very nicely.... [H]owever, [Mr. Scott] said he will get back to me after thinking about it and talking to [Jonathan] Cohen." Ex. CD. Ms. Flynn testified that on June 29, 1988, Mr. Scott congratulated her in advance on the Manager position, saying "I know it will be fine. All you have to do is to go through some interviews and I know they'll be fine." Tr. 382–83.[5]

Mr. Scott testified that despite his concern over Ms. Flynn's limited managerial experience, once he was aware of her interest in the position, he wanted to give her an advantage by being the first candidate to interview with the partners, because he favored promoting employees from within the firm. Mr. Scott testified, "[h]ad she gone through those partner interviews and come out with highly supportive, enthusiastic underwriting ... indicating to me that they would be delighted to have her in that job, I'm sure I would have put her in the job and that would have been the end of the process." Tr. 2084–85. Ms. Flynn was scheduled to meet with seven partners at Goldman Sachs as part of the interview process. Tr. 387. The first four interviews took place on July 12 and 13, 1988. Tr. 388–89. Ms. Flynn testified that shortly after these first four interviews, Mr. Scott told her that the feedback from the interviewing partners was "very positive." Tr. 393. During the morning of July 25, 1988, Mr. Scott reported to Mr. Clovis that Ms. Flynn had met with four partners, whose collective assessment of Ms. Flynn was, in Mr. Scott's words, "generally positive but not outstanding." Ex. CB. At trial, Mr. Scott testified that because the responses from the four partners who interviewed plaintiff first "weren't stronger ... I concluded that we should continue with the process and have the other candidates interviewed in the same process." Tr. 2085. Mr. Scott testified that he relied in part upon the feedback he received from the partners who interviewed the candidates, and in part upon the evaluation of Mr. Clovis, whose professional assessment Mr. Scott stated he trusted and had relied upon in the past. Tr. 2221.

Ms. Flynn claims that she was the lead candidate for the position of Manager and that she should have received the promotion based on what Mr. Scott told her as of July 13, 1988. She argues that the intervening event that derailed her promotion was her termination of Edward Verlander on July 14, 1988.

## 2. The Verlander Termination

Starting in April of 1988, Ms. Flynn was informed of complaints about the performance of Edward Verlander by others at

---

**5.** Although Mr. Scott unequivocally denied ever promising Ms. Smith that she would be promoted to the Manager position, Tr. 2084, the jury was entitled to disbelieve Mr. Scott on this point and credit plaintiff's testimony.

Goldman Sachs. Ms. Flynn testified that she discussed these complaints first with Mr. Scott and then with Mr. Verlander. Tr. 398, 399. By June, Mr. Scott and Ms. Flynn began discussing the possible need to terminate Mr. Verlander. Sometime prior to July 11, 1988, at Mr. Scott's request, Ms. Flynn prepared a document setting out the problems with Mr. Verlander's performance. Tr. 396. By July 14, 1988, Mr. Scott advised Ms. Flynn that she should proceed with the termination of Mr. Verlander, based upon the criticisms that Ms. Flynn noted and the investigation conducted by Ms. Toni Infante, a vice president in the Personnel Department, of the complaints made by people outside the Personnel Department.[6] Tr. 404. Ms. Flynn met with Mr. Scott about the termination before and after she met with, and terminated, Mr. Verlander on July 14, 1988. Tr. 408. Ms. Flynn told Mr. Verlander that he was terminated and that he would receive six weeks severance pay.

The day he was terminated, July 14, 1988, Mr. Verlander went to see Mr. Scott and complained that he had been treated unfairly and asked Mr. Scott to review his termination. Tr. 411. The next day, Mr. Scott advised Ms. Flynn that he was personally going to check the merits of the complaints about Mr. Verlander's performance. *Id.* Ms. Flynn left on vacation on that day, and returned to work on July 25, 1988. Tr. 413. The day she returned, Mr. Scott met with Ms. Flynn, and told her that he had personally investigated the Verlander termination by meeting with three individuals outside the Department who had complained about Mr. Verlander's performance. Tr. 413. Mr. Scott told Ms. Flynn that he stood by his original decision to approve the termination, but that he had increased Mr. Verlander's severance package from six weeks to four and a half months, which also made Mr. Verlander eligible to receive a year-end bonus. Tr. 413–14.

### 3. The Expansion of the Search

On July 25, 1988, Mr. Scott asked Mr. Clovis if there were any other candidates "in the pipeline" for Mr. Scott to consider, given that, as noted above, the partners' assessment of Ms. Flynn to date was "generally positive but not outstanding." Ex. CB. Mr. Clovis responded that there were only three candidates who measured up to Goldman Sachs's level of expectations—Ms. Flynn and two candidates from outside Goldman Sachs, Mr. A[7] and Doris Smith. That same day, after consulting with Jonathan Cohen, the partner in charge of personnel, Mr. Scott advised Mr. Clovis to begin the process of interviewing the two additional candidates. Later that same day, Ms. Flynn had her fifth partner interview; her sixth partner interview took place the following day. Tr. 389.

On August 8, 1993, Ms. Flynn met with Mr. Scott, who told her that Goldman Sachs had expanded the job search to include additional candidates. Tr. 428. That same day, Mr. Clovis sent Mr. Scott the Handy Associates evaluation of Ms. Smith's candidacy. Mr. Clovis wrote:

> We have concluded, after conversations with over 200 sources or potential candidates and more than 30 interviews, that Doris [Smith] is truly at the top of the list. . . .
>
> Doris' technical skills are outstanding, gained both as a consultant and for the past three years with First Boston where management development has been one of her principal functions. Her programs are regarded as innovative and are consistently driven by business and organization needs. . . . She appears to have a rare balance of sensitivity, business toughness, broad vision and credibility with senior management to perform outstandingly in this area. . . .

Ex. BY. After August 8, Mr. A and Ms. Smith were interviewed by the same six partners who interviewed Ms. Flynn, and a sev-

---

6. The uncontradicted testimony is that Mr. Verlander's clients within Goldman Sachs no longer wished to work with him. It thus made no sense to give him the "measured mile" that Goldman Sachs usually gave to those whose performance was substandard. Tr. 2164, 409, 413.

7. To honor the promise of confidentiality made by Handy Associates to candidates who were ultimately unsuccessful, the parties agreed to refer to those candidates by initials.

enth partner, Geoff Boisi, who had been scheduled to meet also with Ms. Flynn. Ex. AO (G1392). According to Ms. Flynn's testimony, between August 8 and September 19, 1988, Mr. Scott told Ms. Flynn that she was still a candidate for the Manager position, even though the search had expanded to consider outside candidates. Tr. 430–31. A Goldman Sachs document dated August 17, 1993, lists Ms. Flynn, Ms. Smith and Mr. A as the three candidates for the Manager position. Ex AO (G1392). Ms. Flynn's seventh partner interview, with Mr. Boisi, did not occur in July due to scheduling difficulties, and ultimately Ms. Flynn never met with Mr. Boisi. Tr. 389, 429. Ex. AO (G1392).[8] On September 7, 1988, Mr. Scott advised Mr. Clovis that although Mr. Scott and Mr. Cohen were impressed by Mr. A, the other partners did not concur. Ex. BX. On September 12, 1988, Mr. Scott advised Mr. Clovis that Ms. Smith was Mr. Scott's choice. Ex. BW. On Goldman Sachs's behalf, Mr. Clovis offered Ms. Smith the Manager position, and she accepted the offer on September 20, 1988. Tr. 1637–38; Ex. BV. Both Mr. Scott and Mr. Cohen testified that they selected Ms. Smith over Mr. A and Ms. Flynn because in their view Ms. Smith was the most qualified candidate. Tr. 2087–88, 2334–35.

On September 22, 1988, Mr. Scott called Ms. Flynn, who was on a business trip in London, to inform her that Goldman Sachs had offered the Manager position to Doris Smith. Tr. 431–32. During that conversation, Ms. Flynn told Mr. Scott that he had just hired the one person in New York who would fire plaintiff within six months, because of certain incidents that occurred four to five years earlier between Ms. Smith and Ms. Flynn when Ms. Smith was an outside

8. At oral argument, plaintiff's counsel argued that when Mr. Scott called Mr. Clovis to expand the search on the morning of July 25, 1988, Ms. Flynn's career was over at Goldman Sachs, because prior to that point Goldman Sachs decided that it wanted to get rid of Ms. Flynn because of her sex. Tr. 2714–15. The court notes that by Ms. Flynn's own testimony, however, after that telephone call between Mr. Scott and Mr. Clovis, she met with two more partners, on July 25 and 26.

9. Ms. Flynn relies on a letter dated August 3, 1988 written by Mr. Verlander to Mr. Cohen as

consultant working with the Department. Tr. 432–33. Ms. Flynn testified that Mr. Scott stated in that conversation that he had no knowledge of any hostility between Ms. Flynn and Ms. Smith. Tr. 433; 2149.

## C. Sufficiency of Evidence to Support the Jury's Verdict

Ms. Flynn claims that Mr. Scott and others at Goldman Sachs reacted negatively to Ms. Flynn's handling of the Verlander termination, and that this reaction was sex-based, causing Goldman Sachs (1) to consider outside candidates, (2) not to offer Ms. Flynn the Manager position, (3) to ultimately terminate her, and (4) to give her a severance package inferior to that given to Mr. Verlander. With respect to the first premise of Ms. Flynn's argument—that the Verlander termination caused Mr. Scott to expand the search to include outside candidates—the court notes that Ms. Flynn testified that Mr. Scott emphatically denied that the Verlander termination had anything to do with the expansion of the search when Ms. Flynn asked him this question directly on August 8, 1988. Tr. 428; 2173. Mr. Cohen also testified that he did not criticize Ms. Flynn for terminating Mr. Verlander. Tr. 2363. Thus, Ms. Flynn offered no affirmative evidence that the Verlander termination influenced Goldman Sachs's decision not to name Ms. Flynn Manager.

Assuming *arguendo* that the jury could legitimately conclude that Mr. Scott and/or Mr. Cohen were upset with Ms. Flynn because of her handling of the Verlander matter, there is no evidence from which to conclude that any dissatisfaction with Ms. Flynn's handling of the matter was based on Ms. Flynn's sex.[9] In other words, Mr. Scott

evidence that Mr. Scott and Mr. Cohen had a sex-based reason for holding Mr. Verlander's termination against Ms. Flynn. In that letter, Mr. Verlander complained that he was treated worse than Norma Berman, another employee terminated by Ms. Flynn in her capacity as Acting Manager. Tr. 420; Ex. 134. Specifically, Mr. Verlander complained that his office was disturbed before he had a chance to clear it out. Mr. Verlander wrote:

Surely, a higher management standard by the department's leadership would have extended to me at least the respect shown to Norma

could have been equally dissatisfied with Ms. Flynn's handling of the Verlander matter had she been a man. Ms. Flynn's inference that Mr. Scott and/or Mr. Cohen acted with gender bias in this situation has no basis in the record.

Ms. Flynn relies on the following facts that the jury could reasonably have found in support of her claim that any negative reaction to her handling of the Verlander matter was sex-based. First, Mr. Scott admitted that the views of Mr. Caporale were significant to him in choosing a permanent Manager. Tr. 1923. Those views include Mr. Caporale's 1987 comment that Ms. Flynn was too "self-promoting," which Mr. Caporale repeated to Mr. Scott in February, March or April of 1988, along with the remark that Ms. Flynn was a "worse character" than Peter Mathias, the former head of the Management Training and Development Department who was asked to resign for misconduct. Tr. 1923; 2159. Mr. Caporale told Ms. Smith on October 17, 1988, Ms. Smith's first day on the job as Manager, that Ms. Flynn was a "treacherous bitch," because she was undermining Ms. Smith's position and had been responsible for the departure of certain men Ms. Flynn had worked with, including Edward Verlander. Ex. 88.[10] Second, the Manager position was

offered to Ms. Smith, even though Ms. Flynn had not yet had her seventh (and final) partner interview. Third, one partner, Richard Menschel, gave Ms. Flynn a qualified recommendation, but stated that he did not think he would offer Ms. Smith the Manager position. Ex. 116, 114. Fourth, Ms. Flynn was the first female in her department to terminate a professional employee. Tr. 398.

## 1. Failure to be Promoted to Manager of Training and Development

Based on the evidence summarized above, there is no rational basis in the record to permit a jury to find that Ms. Flynn's sex played any role in the decision not to promote her to Manager of Training and Development. With respect to Mr. Caporale's views of Ms. Flynn that were known to Mr. Scott, there is no evidence that, even if these views were sex-based criticisms of Ms. Flynn (or were perceived to be such by Mr. Scott), Mr. Scott was influenced by them. Subsequent to Mr. Caporale's 1987 statement that Ms. Flynn was too "self-promoting," Mr. Scott made Ms. Flynn Acting Manager in December of 1987. After Mr. Caporale repeated his criticism in March or April of 1988, Mr. Scott enthusiastically nominated Ms. Flynn for vice president. He also told

Berman. Her office remained untouched for several months. All I needed was a day or two. The real tragedy is that this represents the value and behavior of the 'leadership' of the firm's official training and development function. To my way of thinking a sad day for the firm and the human resources development profession.

Ex. 134. There is no evidence that anyone at Goldman Sachs held this against Ms. Flynn, much less that anyone developed a sex bias against her based on this incident. The court notes that, in any event, the timing of this August 3 letter does not permit it a role in Ms. Flynn's version of what led to her alleged discriminatory treatment by Goldman Sachs. This letter was written after Mr. Scott decided to increase Mr. Verlander's severance and after Mr. Scott expanded the search to outside candidates on July 25. Thus, in Ms. Flynn's version of events, this letter could not have influenced Mr. Cohen or Mr. Scott to decide to discriminate against Ms. Flynn, a decision, Ms. Flynn argues, that was made on July 25, 1988.

10. Ms. Smith testified that the following is the note she made of what Mr. Caporale told her when he called on October 17, 1988:

Welcome back, etc. So glad you're here, we really need you. The other reason I called is to tell you to watch out—you have a young lady reporting to you who is strictly trouble. She's a very treacherous bitch so don't turn your back. She has undermined and destroyed the credibility of every boss she ever worked for, including her present one. And with each, they thought she was the greatest even while she was knifing them in the back. She went out of her way to get at Bob Burke, she messed up Tom Kitrick, she was responsible for what happened to Ricardo Shaw and Ed Verlander and talk has it that she probably helped grease Peter's way out. She has already started with you so please be careful. [Ms. Smith]: How? As only she can—she's damning you with faint praise and raising questions about specific areas of your competence to key people who don't know you. Beyond that, I won't give you any more—just don't turn your back. I can't help you except to counter any talk I hear, and to reassert that you may be the best thing that happened to Goldman for a very long time— definitely as far as your dept. goes. Tr. 1026–27; Ex. 79.

Mr. Clovis on May 9, 1988 that he did not believe that Mr. Caporale's opinion of Ms. Flynn would stand in her way, if Mr. Scott thought she should get the Manager position. Ex. CF; Tr. 1608–09, 2081–82. After that conversation, Mr. Scott touted Ms. Flynn as the lead candidate for the Manager position, even though Mr. Caporale, who was responsible for a department that was a major client of the Training and Development Department, was a critic of Ms. Flynn.

Assuming, as Ms. Flynn claims, that Mr. Caporale's *October 17*, 1988 characterization of Ms. Flynn as a "treacherous bitch" flowed from her termination of Mr. Verlander and her treatment of other males in her department, there is no evidence that Mr. Scott was aware of Mr. Caporale's views on the Verlander matter (1) when Mr. Scott expanded the search on July 25, 1988, or (2) at any time prior to the time Goldman Sachs offered Ms. Smith the Manager position in September 1988. Last, there is no evidence that Mr. Scott or Mr. Cohen spoke with Mr. Caporale between July 12, 1988—when, even according to Ms. Flynn, Mr. Scott supported Ms. Flynn for the Manager position, Tr. 2707–08—and July 25, 1988, when Mr. Scott expanded the search to consider other candidates. Thus, there is no basis for an inference that Mr. Caporale had any influence on the decision ultimately not to offer Ms. Flynn the position of Manager.

The only remaining support for Ms. Flynn's argument that Goldman Sachs did not offer her the Manager position because of their allegedly sex-biased reaction to the Verlander termination is that (1) she never was given the opportunity to meet with the seventh partner, Geoff Boisi, (2) she was rejected in favor of Ms. Smith even though Richard Menschel recommended against hiring Ms. Smith, but Mr. Menschel would have accepted Ms. Flynn in the Manager position, and (3) she was the first woman in the Personnel Department to fire a male professional subordinate.

These first two facts do not support the inference that Ms. Flynn's sex actually played a role in the decision not to promote her. Even if the jury were permitted on the record before it to conclude that Ms. Smith was *not* the most qualified candidate or that the partner interview process was *not* designed to identify the most qualified candidate, the jury had no basis for concluding that Ms. Flynn's sex had a determinative influence on the decision not to offer Ms. Flynn the position of Manager. *See Dister v. Continental Group*, 859 F.2d 1108, 1116–17 (2d Cir.1988) (an employer is not liable for intentional discrimination just because the jury finds that the employer's justification for a personnel decision is so lacking in merit as to call into question its genuineness; if the jury finds that the employer's justification was manufactured to avoid liability, the jury may find for the plaintiff if there is other evidence of pretext). *See also St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993) (disbelief of employer's proffered reasons must be accompanied by affirmative evidence of pretext to show intentional discrimination). Ms. Smith is, of course, a woman, as is Ms. Flynn. This is not a case in which an inference of discrimination can be made from the fact that the position ultimately was filled by a person outside the plaintiff's protected class. *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (where plaintiff is rejected for a position at the same time another candidate is chosen, it is part of plaintiff's *prima facie* case to prove that she was qualified, "but was rejected under circumstances that give rise to an inference of unlawful discrimination"). *See also Rosen v. Thornburgh*, 928 F.2d 528, 532 (2d Cir.1991); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987). The facts that (1) Ms. Smith was chosen over the objection of one partner who gave Ms. Flynn a qualified recommendation, and (2) Goldman Sachs selected Ms. Smith over Ms. Flynn without having the benefit of Mr. Boisi's comparative views on the two candidates, do not sustain the inference that the rejection of Ms. Flynn was sex-based.

Ms. Flynn's third fact in support of the jury verdict—that she was the first female professional to fire a male subordinate—likewise cannot sustain the verdict. Throughout

his summation to the jury, Ms. Flynn's counsel invited the jury to conclude that the only explanation for Ms. Flynn not receiving the Manager job is that she terminated a male employee, and, in Goldman Sachs's eyes, thereby acted too aggressively for a woman. Tr. 2557, 2581–82. Gender had to play a role, according to Ms. Flynn, because, in her view, there was no other explanation for Goldman Sachs's decisions. Tr. 2581–82. Implicit in Ms. Flynn's argument is the invitation to infer sex discrimination without any affirmative evidence linking Goldman Sachs's treatment of her with gender bias.

Even if the jury could find that Mr. Scott intended to promote Ms. Flynn, and even if he promised her she would be promoted, there would need to be a sex-based element in Mr. Scott's change of heart to warrant a finding of unlawful discrimination under the New York State Human Rights Law and Title VII. These laws do not presume that employers act on the basis of sex bias; Ms. Flynn is required to offer affirmative evidence of such invidious discrimination. *See Krulik v. Board of Education,* 781 F.2d 15, 22 (2d Cir.1986) ("We cannot infer that the personal preferences of ... employers are inevitably influenced by [sex]—some additional evidence must be shown."). This record is totally devoid of any evidence that sex factored into any of the decisions at issue here.

For the reasons stated above, the evidence with respect to the Verlander termination and Ms. Flynn's treatment of other male colleagues is insufficient to support the inference that Mr. Scott's failure to promote her was motivated by sex bias.

There is also no evidence to support Ms. Flynn's theory that Mr. Scott or Mr. Cohen knew of any hostility between Ms. Smith and Ms. Flynn such that the choice of Ms. Smith could be viewed as a means to effectuate a termination of Ms. Flynn.[11] In January or February of 1988, Ms. Smith met informally with Mr. Scott and Mr. Cohen, at which time she stated that others had told her that the Goldman Sachs Management Training and Development Department was "demoralized" and was having "some functional problems" at the time Ms. Flynn took over from Peter Mathias. Tr. 964–65. Ms. Flynn herself acknowledges that the Department was demoralized and poorly managed at the time she took it over in January of 1988. Tr. 2725. Despite Ms. Smith's denial that she ever repeated any negative comments about the department when she was interviewed by the partners in August 1988, Tr. 1004, and despite the fact that there is no evidence contradicting her testimony, Ms. Flynn maintains that it is inconceivable that, at Ms. Smith's interviews, Ms. Flynn's name did not come up, *and* that Ms. Smith did not express negative views about Ms. Flynn's management of the department. Ms. Flynn also contends that it is inconceivable that Ms. Smith's dislike of Ms. Flynn was not discussed at a lunch in March of 1988 among Mr. Scott, Mr. Cohen and Thomas Kitrick, a former Manager of the Department who was aware of this alleged dislike.

Although the jury could have found that there was a preexisting dislike between Ms. Smith and Ms. Flynn, if they believed Ms. Flynn and disbelieved other witnesses on this point, the jury would be speculating if it found that the subject of Ms. Smith's dislike of Ms. Flynn must have come up in the interviews or at some other time. Such speculation would contradict the testimony of those who participated in the interviews and in the lunch meeting that they have no recollection of any hostility between Ms. Flynn and Ms. Smith being mentioned. Tr. 2076–77, 2167–68, 2213, 2351. Ms. Flynn herself testified that when she raised the issue of a bad relationship between herself and Ms. Smith to Mr. Scott in September 1988, immediately after Ms. Smith was hired, Mr. Scott told Ms. Flynn he had no prior knowledge of any such relationship. Tr. 433. If the jury disbelieved Mr. Scott's statement, that disbelief is not a sufficient basis for concluding

---

11. The court notes that Ms. Flynn does *not* allege that Ms. Smith was motivated by sex discrimination when she recommended (1) not naming Ms. Flynn to the position of Manager of Sales Training, and (2) terminating her. Charge at 23, 25. Ms. Flynn's theory is that *Ms. Smith* was motivated by *hostility* towards Ms. Flynn, and that Goldman Sachs accepted Ms. Smith's recommendations because *Goldman Sachs* was motivated by *sex discrimination. Id.*

that Ms. Smith's alleged hostility towards Ms. Flynn was discussed either at the March 1988 lunch or at Ms. Smith's August 1988 interviews. *See Martin,* 762 F.2d at 217; *Wilson v. Supreme Color Card, Inc.,* 703 F.Supp. 289, 298 (S.D.N.Y.), *aff'd without op.,* 880 F.2d 1320 (2d Cir.1989). There is no reason to assume that the subject of such hostility necessarily would have come up, and speculation that it was discussed cannot support the verdict.

In sum, there is no evidence from which reasonably to infer that Ms. Flynn was not promoted to the position of Manager of Training and Development because of her sex.

### 2. Failure to be Named Manager of Sales Training and Termination

Ms. Flynn also contends that Goldman Sachs accepted Ms. Smith's recommendation (1) not to name Ms. Flynn Manager of Sales Training in December of 1988, and (2) to terminate her on March 7, 1989, because of her sex. Inasmuch as Ms. Flynn claims that Goldman Sachs's discriminatory motive originated with the Verlander termination in July of 1988, these additional claims have no basis in the record, for the reasons stated above. Although plaintiff's counsel limited his argument to claiming that all the purported discrimination against Ms. Flynn flowed from her termination of Mr. Verlander, the court will proceed to review the totality of the evidence before the jury to decide whether there is any evidence to support the jury's finding that Goldman Sachs terminated Ms. Flynn because of her sex.

The jury could find that in November 1988, Ms. Smith informed Mr. Scott of the substance of the telephone call she had received from Mr. Caporale on October 17, 1988, without identifying Mr. Caporale as the caller. Tr. 1038, 1049. Mr. Caporale left Goldman Sachs at the end of November 1988. Tr. 1415. The knowledge that an unidentified employee of Goldman Sachs referred to Ms. Flynn as a "treacherous bitch" and linked that characterization to the Verlander termination is insufficient evidence that Ms. Flynn's sex played a role in Mr. Scott's acceptance of Ms. Smith's recommendation not

to name Ms. Flynn Manager of Sales Training as of December 13, 1988.

In late February or early March 1989, Ms. Smith met with Mr. Scott and Mr. Cohen to discuss Ms. Flynn's performance. Ms. Smith, in the course of giving Mr. Scott and Mr. Cohen her own assessment of Ms. Flynn's alleged undermining of Ms. Smith and unsatisfactory job performance, mentioned that Mr. Caporale had previously expressed a view of Ms. Flynn (as a "treacherous bitch") that was corroborative of her own view of Ms. Flynn's conduct. Tr. 1045; 1053. The court concludes that there is no evidence to support the inference that Mr. Scott's and Mr. Cohen's learning, months after Mr. Caporale left Goldman Sachs, of Mr. Caporale's earlier remark, poisoned either of them to such an extent that a jury could find that Ms. Flynn's sex had a "determinative influence" on Goldman Sachs's acceptance of Ms. Smith's decision to terminate Ms. Flynn. *See NLRB v. Martin A. Gleason, Inc.,* 534 F.2d 466, 474 (2d Cir.1976) (An "inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and is not one of two or more inferences, both or all of which are about equally probable"). Because, as discussed above, Mr. Scott was willing in May 1988 to ignore Mr. Caporale's opinion of Ms. Flynn, there is no reason to infer that he would, or did, take Mr. Caporale's opinion more seriously in March 1989. Mr. Caporale left Goldman Sachs at the end of November 1988, Tr. 1415, eliminating any possible reason Mr. Scott or Mr. Cohen would have to terminate Ms. Flynn on March 7, 1989 in order to satisfy Mr. Caporale.

In *Smith v. Firestone Tire and Rubber Co.,* 875 F.2d 1325, 1329 (7th Cir.1989), the Seventh Circuit Court of Appeals affirmed a trial judge's grant of a directed verdict for the employer in a race discrimination suit. There, the plaintiff attempted to demonstrate that his race played a role in his manager's decision to demote him. The plaintiff's evidence included remarks by the manager that the manager did not like plaintiff's "type," and that one of plaintiff's "type" in a supervisory position was enough. The court held that these statements were insufficient to

demonstrate that the manager relied on the plaintiff's race in demoting him. The court stated, "plaintiff had failed to provide the requisite nexus between the statements made by defendant and the demotion of plaintiff to demonstrate that plaintiff's race was a 'substantial factor' in the defendant's decision." *Id.* at 1330. *See also Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1988) (O'Connor, J., concurring) ("statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" are insufficient to establish that sex is a substantial factor in the decision); *Haskell v. Kaman Corp.,* 743 F.2d 113, 120 (2d Cir.1984). Likewise, here, Ms. Flynn's evidence is insufficient to sustain the inference that the Caporale remark influenced Mr. Scott or Mr. Cohen to accept Ms. Smith's recommendations (1) not to name Ms. Flynn Manager of Sales Training, and (2) to terminate her.

### 3. Severance Package

■ The jury also found for Ms. Flynn on her claim that her severance package was less than that offered to similarly situated male employees at Goldman Sachs. Ms. Flynn's total severance pay of $34,165 was several thousand dollars less than Mr. Verlander received. Tr. 2581. Mr. Verlander was provided with secretarial services and was permitted to maintain the appearance that he remained a full-time employee through the end of November 1988. Tr. 423–24. Ms. Flynn was offered, but declined, the use of Goldman Sachs's outplacement services. Based on the evidence in the record, the jury could not reasonably have found that any differential in severance packages

was due to Ms. Flynn's sex. The record is uncontroverted that Goldman Sachs has a highly discretionary severance policy that takes into account the notice an employee has had prior to termination that his or her job was in jeopardy in calculating the appropriate severance pay period. Tr. 2159–61, 2008–09. Ms. Flynn testified that in mid-November 1988, after Ms. Smith met with Mr. Scott to discuss Ms. Flynn's alleged efforts to undermine Ms. Smith's position as Manager of the Department, Mr. Scott gave Ms. Flynn a choice between resigning or working faithfully under Ms. Smith's supervision. Tr. 469–71. Mr. Scott testified that, in addition, he offered Ms. Flynn a third option, to transfer to another position, Tr. 2189–90, but Ms. Flynn testified that transfer was an illusory option because any transfer was subject to Ms. Smith's veto. Tr. 469–70. Mr. Scott and Mr. Cohen each testified that he viewed Ms. Flynn as being on notice that her job was in jeopardy as of mid-November 1988, Tr. 2195, 2342, a view that is reasonable in light of Ms. Flynn's testimony as to what Mr. Scott told her. Also in mid-November, Mr. Scott offered Ms. Flynn a two week paid leave of absence to assess her future at Goldman Sachs and consider whether she could work faithfully under Ms. Smith or whether she would rather choose another option.[12] Ms. Flynn accepted that offer, and in mid-November, began the two weeks paid leave to consider her options. Tr. 472; 2188–89. Although on her return on December 5, 1988, Ms. Flynn told Mr. Scott she would work with Ms. Smith, Tr. 470–71, 2188, Ms. Flynn had every reason to know that she remained on notice that her job was in jeopardy.

Mr. Scott testified that the increased severance package he granted Mr. Verlander

---

**12.** There is no evidence in the record that any other employee was ever given a similar offer. Mr. Scott testified that he offered this to Ms. Flynn for the following reasons:

I instigated this leave personally. The reason I did that, I had become extremely concerned with the way this thing was going and the relationships. Frankly, I was a little concerned about Mrs. Flynn's state of mental health. I don't mean that in a clinical way. But she was obviously very, very tense, and I was concerned about that.

It just seemed to me we needed a truce and an opportunity for her to get out of there for a

period of time, out of the tension, reflect on what was going on, and make a decision about what she wanted to do. Because it really was at that point, she either had to decide that she was going to get on board and function in the department as a responsible individual or we would have to take some other means.

I wanted to give her a great opportunity as I saw it to reflect on that without the pressure of day-to-day business. She turned me down, by the way, at first, but after reflection decided to take that opportunity.

Tr. 1981.

was based upon Mr. Scott's belief that prior to July 14, 1988, Mr. Verlander had not received adequate notice that his job was in jeopardy. of termination. Although Ms. Flynn testified that she discussed criticisms of Mr. Verlander's performance with Mr. Verlander starting in April 1988, the evidence does not support an inference that Mr. Scott's view of the adequacy of the notice given Mr. Verlander was implausible, Tr. 2202, or even if it were implausible, that the reason Mr. Scott allegedly favored Mr. Verlander was sex-based. *See Dister,* 859 F.2d at 1116. The issue for the jury was not whether Mr. Scott was in fact correct regarding the adequacy of the notice of impending termination given to Mr. Verlander and Ms. Flynn. The question for the jury was whether the evidence supports Ms. Flynn's claim that Mr. Scott's reliance on the adequacy of notice is a reason advanced to avoid liability for sex discrimination and not the true reason that the severance packages differed. On this issue, the evidence is insufficient to support the jury's verdict.

* * *

In summary, the court finds that "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture." *Lambert v. Genesee Hospital,* 10 F.3d 46, 56. The evidence here is insufficient as a matter of law to sustain the jury's verdict in Ms. Flynn's favor.[13] The court notes that particularly where, as here, plaintiff's counsel's summation to the jury was infused with an appeal to (1) consider improper factors such as the wealth of Goldman Sachs, and (2) speculate as to the reason Ms. Flynn was not promoted and terminated, Tr. 2554, 2557, 2570, 2577, 2578, granting a

motion pursuant to Rule 50 is necessary to "protect[ ] neutral principles of law from powerful forces outside the scope of the law—compassion and prejudice." *Unijax, Inc. v. Champion Int'l, Inc.,* 516 F.Supp. 941, 950 (S.D.N.Y.1981), *aff'd,* 683 F.2d 678 (2d Cir.1982) (citation omitted). *See also Foster v. Tandy Corp.,* 828 F.2d 1052, 1056 (4th Cir.1987).

## II. Motion for a New Trial

Alternatively, even if the court did not grant Goldman Sachs's motion for judgment as a matter of law, the court would grant Goldman Sachs's motion for a new trial pursuant to Fed.R.Civ.P. 59 because the verdict was against the weight of the evidence. The evidence in this case overwhelmingly supports Goldman Sachs's contentions that each of its challenged decisions concerning Ms. Flynn was fair and not sex-based. In addition, and as a separate matter, the court believes that the jury's ability to understand the connections (and lack of connections) among the disparate pieces of evidence was hindered by Ms. Flynn's pursuit of varying theories of her case mid-trial.

Goldman Sachs has met its burden of showing that the verdict in this case is so strongly against the weight of the evidence that the jury's verdict may be characterized as a "seriously erroneous result." *Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992); *Smith v. Lightning Bolt Products,* 861 F.2d 363, 369 (2d Cir.1988). For all the reasons stated above, the court grants Goldman Sachs's motions for judgment as a matter of law and for a new trial.

## III. Title VII Claims

With respect to the Title VII claims tried before the court, this Memorandum Opinion

---

13. Prior to trial, the court denied Goldman Sachs's motion for summary judgment on all claims. At that time, the evidence appeared to be more favorable to Ms. Flynn than it was at trial. Among other things, before trial, Ms. Flynn proffered a memorandum dated in 1987 permitting the inference that Ms. Flynn was in fact promoted to vice president in 1987, but that her name was crossed off the list after Mr. Caporale's comment that she was too self promoting. During the trial, the court was advised by plaintiff's counsel that he had erred in previously

stating, in plaintiff's Local Rule 3(g) Statement, that Ms. Flynn received that memorandum in 1987. After Goldman Sachs offered to produce the secretary who allegedly erred in dating the memorandum 1987 instead of 1988, Ms. Flynn acknowledged that she actually received the memo in 1988. Further, it was not until trial was well underway that Ms. Flynn admitted for the first time that she understood her job as Acting Manager to be temporary, thus eliminating her claim under the Equal Pay Act.

and Order shall constitute the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52. The court finds that Ms. Flynn has failed to demonstrate that her sex "actually played a role and had a determinative influence." on the outcome of any of Goldman Sachs's employment decisions adverse to Ms. Flynn. *See Hazen Paper Co.,* —— U.S. at ——, 113 S.Ct. at 1706. For all the reasons stated above, the court finds that Ms. Flynn was not the victim of intentional discrimination because of her sex. *See St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). The court, therefore, grants judgment for Goldman Sachs on Ms. Flynn's Title VII claims.

### Conclusion

The court grants Goldman Sachs's motions for judgment as a matter of law and for a new trial. The jury's verdict is hereby set aside. The Clerk of the Court is directed to dismiss the complaint with prejudice and to enter judgment in favor of Goldman Sachs.

SO ORDERED.