Donald BINDER, Plaintiff,

v.

LONG ISLAND LIGHTING
COMPANY, Defendant.

No. 88–CV–1315.

United States District Court,
E.D. New York.

March 29, 1994.

Lawrence C. Downes, Gilroy Downes Horowitz & Goldstein, New York City, for plaintiff.

Robert J. Grey, General Counsel by Mindy S. Novick, Long Island Lighting Co., Hicksville, NY, for defendant.

### Memorandum of Decision and Order

MISHLER, District Judge.

Donald Binder sued his former employer, defendant Long Island Lighting Company ("LILCO"), alleging willful violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. (1988) ("ADEA") and New York Executive Law § 296 et seq. Binder claims that LILCO discriminated against him because of his age by terminating his employment and by not finding him another position within LILCO despite the fact that other positions were available and that many were given to individuals younger than Binder.

The case was tried to a jury from October 25, 1993 through October 27, 1993. At the close of plaintiff's case-in-chief, LILCO

moved for judgment as a matter of law based on the lack of evidence that would establish that age played any part in LILCO's decision to terminate Binder. The court denied LILCO's motion, but indicated that "if the jury comes out with a verdict for the plaintiff, you just renew your motion, and then I will give it very serious thought." T.341. At the close of all the evidence, LILCO renewed its motion.[1] Following the jury's verdict in Binder's favor, LILCO again renewed its motion for judgment as a matter of law. In the alternative, LILCO moved for a new trial pursuant to Fed.R.Civ.P. 59 on the grounds that the verdict was against the weight of the evidence and contrary to law, and in the alternative again to remit the damage award for pain and suffering as grossly excessive and against the weight of the evidence. For the reasons below, the court grants the motion for judgment as a matter of law and, in the alternative, grants the motion for a new trial. Fed.R.Civ.P. 50(c)(1). Even if these motions were not granted, the court would grant a new trial on the issue of damages, since the amount of damages found by the jury is unsupported by the evidence. Fed. R.Civ.P. 59(d).

## I. Specificity of the motion for judgment as a matter of law

As a threshold matter, Binder asserts that LILCO did not make its initial motion for judgment as a matter of law with the requisite specificity. Because of this, he argues that its renewed motion should not be considered by the court.

At the close of Binder's case, LILCO moved "for judgment as a matter of law *on the basis that there is no evidence put on this record to establish that age has any role, played any part in the decision to terminate plaintiff.*" T.341[2] (emphasis added). The italicized language is sufficiently definite to preserve LILCO's current motion.

The cases cited by Binder are all inapposite. In *Piesco v. Koch,* 12 F.3d 332 (2d

Cir.1993), the defendant made its Rule 50(a) motion by saying, "Defendants move for a directed verdict." The defendant in *Heller v. Champion Int'l Corp.,* 891 F.2d 432, 436 (2d Cir.1989), failed entirely to raise a claim in its initial motion for a directed verdict; the Second Circuit would not consider the argument in the motion j.n.o.v. In *Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 368 (2d Cir.1988), the defendant moved for a directed verdict by "stat[ing] simplistically that 'plaintiff has failed to make out a prima faci[e] case'". Furthermore, the Second Circuit found that the defendant made no motion at all addressed to the elements of a count of fraud. *Id.* at 367–68. Finally, in *Meriwether v. Coughlin,* 879 F.2d 1037, 1040 (2d Cir.1989), the defendant moved by saying, "'... defendants wish to move for a judgment notwithstanding the verdict.'"

None of these statements is sufficient "to give the claimant a fair 'opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury.'" *Smith,* 861 F.2d at 367, *quoting* 5A MOORE'S FEDERAL PRACTICE ¶ 50.08 at 50–88 (1992). By contrast, the motion made here by LILCO clearly indicated that, in LILCO's view, there was no evidence of a necessary element of Binder's claim—that is, that age played a role in LILCO's decision not to consider him for other positions for which he may have been qualified. That motion is sufficient as a matter of law, and this court will consider the motion on the merits. *See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 586 (2d Cir.1987) (sufficient specificity to challenge contract formation when counsel said, "plaintiff cannot produce any cognizable evidence that a valid contract exists."); *Posadas de Mexico, S.A. de C.V. v. Dukes,* 789 F.Supp. 121, 123 n. 1 (S.D.N.Y.1992) (sufficient specificity under Rule 50(b) when counsel said "plaintiff has not proven his case nor has he proved any elements of fraud ... against Mr. Rufer.").

---

**1.** I mentioned Rule 29(c) several times during discussions about LILCO's anticipated motion. T.399, 492. As I later realized, I was referring to the criminal rule that gives a defendant the opportunity to move for acquittal. The record was amended, with no objection, to indicate Rule 50 wherever I had referred to Rule 29(c). T.493.

**2.** "T.___" refers to the trial transcript.

## II. Legal Standard for Judgment as a Matter of Law

■ Fed.R.Civ.P. 50(a) [3] states:

(a) Judgment as a Matter of Law.

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

The Second Circuit has interpreted this rule to require " 'such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result o[f] sheer surmise and conjecture,' or that the evidence be 'so overwhelming that reasonable and fair minded persons could only have reached the opposite result.' " *Lambert v. Genesee Hospital*, 10 F.3d 46, 56 (2d Cir. 1993), *petition for cert. filed*, No. 93–1388 (U.S. Mar. 7, 1994) (quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir.1992), which quotes in turn *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988), *cert. denied*, 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989)).

■ In deciding a Rule 50 motion, the court must construe the evidence most favorably to the non-moving party without weighing the evidence or passing on the credibility of witnesses. *Samuels v. Air Transport Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *Flynn v. Goldman, Sachs & Co.*, 836 F.Supp. 152, 154 (S.D.N.Y.1993). Furthermore, there must be some affirmative evidence to support plaintiff's version of the facts. "[T]he party bearing the burden of proof cannot create an issue for the jury's resolution by relying solely on the hope that the jury will not trust the credibility of the witnesses." *Flynn*, 836 F.Supp. at 154. " 'If all of the witnesses deny that an event essential to plaintiff's case

occurred, he cannot get to the jury simply because the jury might disbelieve some of those denials. There must be some affirmative evidence that the event occurred.' " *Martin v. Citibank, N.A.*, 762 F.2d 212, 217–18 (2d Cir.1985) (*quoting* 9 CHARLES WRIGHT & ARTHUR MILLER, Federal Practice & Procedure § 2527 at 563 (1971)). Because Binder has not introduced any affirmative evidence that age played any part in LILCO's decision to terminate him, he cannot meet this burden.

■ Binder's theory of the case is that LILCO (1) eliminated his then-current position, (2) refused to create a new position for him, and (3) refused to consider him for any other available positions for which he was qualified, all because of his age. *See Hazen Paper Co. v. Biggins*, —— U.S. ——, ——, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993) ("In a disparate treatment case, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision."). Although the first two claims are no longer in the case, *see Binder v. Long Island Lighting Co.*, 933 F.2d 187, 192 (2d Cir.1991) (*Binder I*), Binder contends that LILCO considered only his age and not his accomplishments in deciding not to offer him any other available position in the company.

LILCO claims that it had a nondiscriminatory reason for not having considered Binder for other positions. Its position is that (1) Binder never applied for any positions within the company that were filled by a self-nomination process, and (2) LILCO felt that Binder was overqualified for the positions that were open and for which its human resources department recommended candidates, and it had a policy against placing people in such positions.

Without weighing the evidence or passing on the credibility of witnesses, we examine the evidence in the light most favorable to Binder to determine whether age played a

---

**3.** Fed.R.Civ.P. 50 was amended effective Dec. 1, 1993. The amendment was technical, correcting an ambiguity in the text of the 1991 revision. *See* Fed.R.Civ.P. 50(a)(1), Advisory Committee Notes. Since it would be "just and practicable" to apply the newest version of the rule in this case, that is the version that will apply. The analysis under the 1991 version would be the same.

role in LILCO's decision not to offer him an alternative position.

## A. The Evidence in the Light Most Favorable to Binder

Binder was born on August 31, 1929. He graduated from Brooklyn Technical High School in 1947, and spent the next four years alternating between working for Manufacturer's Hanover and serving in the Army. In 1951, Binder began attending classes at Brooklyn Polytechnic, and graduated with a bachelor's degree in mechanical engineering in 1955. In July 1955, he began working for LILCO as a junior engineer.

Over the next 31 years, Binder worked his way up through a variety of jobs, earning favorable performance evaluations and receiving "good" raises. T.37. He acted as project engineer on certain projects, which included design and management responsibilities. His progression in job titles was junior engineer (1955–58), associate engineer (1958–64), engineer (1964–69), senior engineer (1969), Shoreham quality assurance administrator (1969–70), project engineer (1970–73), division manager (1973–79), department manager (1979–84), assistant to the vice president of nuclear operations (5/84–11/84), and engineering consultant (1984–87). Each new job required more or different knowledge and skill than the one before.

Throughout his 31 years with LILCO, Binder received favorable performance reviews and salary increases. T.37, 52–53, 57–58, 60, 71–75; Pl.Ex. 1–4. He started out with LILCO in its gas division, acting as project engineer on a number of projects. In 1962, he oversaw the design and construction of gas manufacturing plants in Bayshore; he also obtained hands-on training in power plant operations. He was also asked to familiarize himself with the Enrico Fermi nuclear plant, which was partially owned by LILCO, in New Jersey.

As part of a program offered only to about a dozen employees at LILCO, Binder received his master's degree in nuclear physics from Long Island University. He also took courses in reactor safety at M.I.T., and in nuclear operations and design at the University of Michigan. Starting in 1963, Binder became involved in LILCO's nuclear area, and was the original quality assurance administrator on the Shoreham nuclear project. He later became the project engineer for Shoreham. T.39–45.

Binder was the first division manager of LILCO's newly-formed Division of Nuclear Engineering; he organized the division from its inception. When the division was elevated to departmental status, Binder became its first department manager. In May 1984, Binder became Assistant to the Vice President, Nuclear, and helped to orient him to Shoreham, as it was about to come on line at low power. T.52–58.

In December 1984, Binder was transferred to the position of Consulting Engineer on the staff of Dr. Matthew Cordaro, Vice President of Engineering and Administration. Cordaro was thirteen years younger than Binder. Binder continued to work under Cordaro when the latter was promoted in 1985 to Senior Vice President, Operations and Engineering. T.59–61; Pl.Ex. 57.

As Cordaro's assistant, Binder had broad responsibilities. He acted as Chairman of the Work Order Committee, which was formed to deal with the problem of cost overruns on many of LILCO's large projects. The Committee's report resulted in the establishment of the Project Management department. Binder also chaired other similar committees, and was a general troubleshooter for Cordaro in many important situations. T.61–67.

In addition, Binder acted in many respects as Cordaro's alter-ego. He represented Cordaro in dealings with outside consultants, as well as within LILCO at meetings where substantial policy issues were discussed. T.81, 312.

Binder performed well as Cordaro's assistant. His overall ratings for 1985 and 1986 were "Commendable", although the component ratings of the overall rating ranged from "Competent" to "Distinguished".[4] Pl.

---

4. The rankings were "Provisional" (lowest), "Adequate", "Competent", "Commendable", and "Distinguished" (highest).

Ex. 2, 4. During the two years he was Cordaro's assistant, Binder received raises totalling $7,200.00. Pl.Ex. 1.

Binder was not Cordaro's only assistant; Walter Ferraro was the other. Ferraro was about ten years younger than Binder. Pl.Ex. 63. His position was similar to Binder's, in that he ran interference for Cordaro and acted as Cordaro's eyes and ears, although in different areas of expertise.

Dr. William Catacosinos took over as Chairman of LILCO in 1984. He immediately ordered a massive reorganization, including a large reduction in force. T.53. In addition, he wanted his senior management to take an active role in their jobs. He and Cordaro had been having conflicts in regard to Cordaro's management style, which was to delegate a large amount of responsibility to his staff assistants, Binder and Ferraro. As part of his managerial philosophy, Catacosinos directed in late 1985 that all Staff Assistant positions, including those held by Binder and Ferraro, be eliminated. When Cordaro was promoted to Senior Vice President, Catacosinos tried (to no avail) to ensure that he bring no staff assistants with him. Catacosinos had to speak with Cordaro twice before Cordaro finally eliminated the positions of his Staff Assistants in September 1986.[5] T.313–15.

Meanwhile, in the summer of 1986, Binder was approached by people outside of LILCO about setting up a business venture. Binder thought seriously about accepting their proposal. He went so far as to speak with Cordaro about the availability of early retirement. Cordaro, seeing a way to forestall the elimination of Binder's position, mentioned Binder's interest in early retirement to Catacosinos, Russell Youngdahl, the president of LILCO, and Robert Kelleher, Vice President of human resources.[6] T.315.

Cordaro notified Binder sometime in September 1986 that his position, along with Ferraro's, was going to be eliminated. At that meeting, he told Binder to see Kelleher about finding another position within LILCO.

Within a week or two, by the end of September or the beginning of October, Binder went to see Kelleher. He told Kelleher that he assumed Kelleher knew that his job was being eliminated, and he asked Kelleher what he could do to find him another position. Kelleher asked him his preferences, which Binder gave him. They included project management, for which Binder felt qualified because of the committee he had chaired, co-generation, refuse recovery, nuclear, and engineering. Kelleher told Binder that he would look into it and get back to him. T.78–80, 292. Binder also discussed early retirement with Kelleher, asking what packages were available. T.295–96. Kelleher testified that he told Binder, although not in so many words, that if he did not find an alternative position, he would have to leave LILCO. T.294–96.

Binder never told Kelleher that he was relying on Kelleher to find him a new position, although he testified that as far as he was concerned he was leaving the matter of finding a new position for him entirely in Kelleher's hands. T.214–15, 217. At the time, no one at LILCO knew whether Binder was going to leave voluntarily to pursue his business venture. If he had done so, it would have been by January 1, 1987. Because of this, Kelleher set no deadlines for Binder at the meeting, and Binder left with no sense of urgency about his position. Binder never asked Kelleher how long he had before his position was to be eliminated. T.213–15.

Binder returned from his meeting with Kelleher and told Cordaro that it had been a good meeting. Cordaro suggested that Binder talk with Christopher Cole, the project manager of the new Project Management department. T.81. As it turned out, Cole approached Binder before the latter had the chance to seek out Cole. Cole knew that Binder's position was being eliminated, although Binder had not told anyone in LILCO

---

5. Binder does not contend that the decision to eliminate the Staff Assistant positions was age-based. T.237–38.

6. Kelleher became Vice President of Human Resources on July 1, 1986; prior to that, he was Assistant Vice President in the same department. T.286.

about his situation. Cole asked Binder whether Binder would have an interest in joining the Project Management department. Binder did express an interest, and Cole suggested that he speak with Martin Mullarkey, one of the division managers in the Project Management department. T.82, 90–91.

Binder knew Mullarkey well. He had hired Mullarkey into LILCO, and Mullarkey had worked for him for a time in the Nuclear Engineering department. Mullarkey had work that he thought Binder could do, although they did not discuss a specific position. That work was a manual to instruct project managers on how to manage a project. This was needed within the department, and was also needed to show LILCO in a positive light in an ongoing Public Service Commission audit. Binder told Mullarkey that if the position went through he would give 100 percent. Mullarkey gave Binder reference material concerning the manual; Binder glanced at it, but did not actually do any work on it. T.228–29.

According to Binder, Mullarkey filled out a change of status form, which was the first step in arranging for Binder's transfer to Mullarkey's group. T.93–94. Binder and Mullarkey did not discuss job title or salary level, both of which were required on a change of status form. T.230–31.

LILCO denies that a change of status form was ever filled out; Cole testified that he never prepared one for Binder. T.270. Within a day or two, Binder met with Cole again. After that meeting, he prepared a personnel requisition form, which could not be located, that requested authorization for a position for Binder to allow him to work on the manual. Pl.Ex. 52, 53. A requisition form creates a new position; a transfer (change of status) form moves an employee from one position to another. T.277–78. After Cole signed the requisition form, it went to Cordaro for his signature and then to Catacosinos for final approval. Catacosinos

denied authorization for the new position. T.271.

Cole took his position in August 1986. By the beginning of October 1986, he had filled all of the division manager positions in the Project Management department, T.264, which were filled by the management succession process.[7] Once those positions were filled, the managers worked together to develop staffing plans for each of the divisions. They ultimately developed a long-term plan with multi-phase staffing. T.254, 264–65; Pl. Ex. 50. That is, a nucleus of personnel would be put in place from the start, and further additions to the complement would be made until the department was staffed at the levels planned for in the long-range plan. T.264–66; Pl.Ex. 50, 51.

Once the division managers were in place, 18 subordinate positions were requested for Mullarkey's division. Pl.Ex. 51. Ten of the positions were approved and transferred from other areas in LILCO. Some of them were already staffed; the vacancies were filled by the posting process. T.266–67. Catacosinos refused to add any positions to the organization, so the eight remaining positions were approved by him *provided* that they could be found already in LILCO and merely transferred to the new division. *Id.* In other words, there was no authorization to increase the corporate complement. Seven positions were found and transferred; those positions were also filled by the posting process during late 1986 and early 1987. T.268. The eighth position was a clerical one, and ultimately was not found. T.268, 271.

Catacosinos refused to create a new position for Binder or anyone. T.271. Although there were two vacant positions in Cole's department, neither of them was rated to allow Binder to do the work he had discussed with Mullarkey (i.e., the manual). T.271–72. Furthermore, Cole thought that Binder was not suited for the vacancies, which would have been filled by a self-nomination process. T.270–72. Cole continued to try to get au-

---

7. The three divisions in the department were Project Management Control, headed by Mullarkey, who took his position effective Oct. 1, 1986; Contract Management, headed by G.J. Rohloff, who was younger than Binder and who took his position effective Aug. 1, 1986; and Construction Management, headed by J.J. Kavanaugh, who was younger than Binder and who took his position effective Oct. 1, 1986. T.180–83; Def.Ex. A.

thorization for another position in the department after Binder left LILCO. T.272–73. Binder put forward no evidence that the position Cole sought to create for Binder was ever approved by Catacosinos.

As part of the long-range plan for the Project Management Department, in May 1987 Cole asked that the complement of the department be increased by 14. Pl.Ex. 55. This request was granted, and the positions were then filled either by the posting process or by hiring new employees through help-wanted advertisements. T.272–73; Pl.Ex. 50.

### 1. Binder's Termination

During the time from October 1986 to February 3, 1987, Binder continued to work on Cordaro's staff; he did not do any work on the matters he had discussed with Mullarkey. He was acting as the liaison between LILCO and an outside consulting group that was formulating a critique of the fossil fuel department. T.81–82.

Binder was aware that what he thought was the change of status form would have to be approved by Cordaro. He never asked Cordaro about the status of the form, however, nor did he follow up with respect to the elimination of his position. Neither did he call Kelleher to tell him that he had found a new position with Mullarkey.

Sometime near the end of 1986, it became clear that Binder was not going to pursue his business venture and take early retirement. At that point, Youngdahl told Cordaro and Kelleher that the target date for the elimination of Binder's position, since he was not going to pursue his business venture, was February 1, 1987. T.320–21. During late 1986, Ferraro's position had been eliminated, and he had been placed in another position, which he subsequently left because he was unhappy with it.

On February 3, 1987, Cordaro told Binder that Catacosinos had forbade the creation of a new position in the Project Management department. Furthermore, no other position would be offered to Binder. Since he had not found a position on his own, he therefore had to take early retirement. T.244.

When Binder asked why, Cordaro told him that the chairman had said that Binder was a poor performer. He also said that he thought it might be a whim. Cordaro never indicated that age had any impact whatsoever on Catacosinos' decision. T.246. The meeting took Binder by surprise; he claimed he had no indication prior to the February 3 meeting that his termination was imminent. T.97.

Kelleher testified that he spoke with Binder within a week or so of Binder's leaving for good, sometime around February 5, 1987. Kelleher went to Binder's office. He had discovered that Binder was still doing work for Cordaro, and was concerned that both Cordaro and Binder might have thought that there was no rush to find Binder alternate employment. He asked Binder if he realized that he had only a week or so before his position was finally to be eliminated, and that the final deadline had been February 1, 1987. He testified that Binder was surprised. T.321–22.

Binder asked Kelleher to explain why the chairman thought he was a poor performer. Kelleher told him to think of it in terms of the mass layoffs in 1984, during which about 500 people (including about 150 managers) were let go. Binder was incredulous that, after 31 years with LILCO, no other position would be found for him. T.96–97. He asked Kelleher what the "real story" was. Binder testified: "[Kelleher] said, 'I am not going to bullshit you Don.' Look at me in the eye and then silence. And that was that." T.97.

Kelleher told Binder that his last day would be February 13, to give him a chance to clean everything up and process through human resources' exiting procedures. When human resources asked Binder to fill out a "voluntary retirement" form, he refused, signing it under protest. T.97–98.

### 2. Personnel Movement at LILCO

Jobs at LILCO were filled in one of two ways. The first was called "management succession". In that process, which was used to place people in the position of division manager or higher, T.261–62, 274, 323–24, the human resources department nominated

candidates, who then went through an interview process. As part of the management development process, managers would sometimes be assigned to an area temporarily to broaden their background and experience. T.307, 320. People were rotated through the temporary assignment program only if they had a permanent position waiting for them when their rotation was done.

The second method of filling jobs was self-nomination. All vacancies below the division manager level were posted on bulletin boards throughout the company with a description of the job's salary range, qualifications and duties. The postings generally stayed up for a few weeks. As candidates applied, they too were interviewed, and the successful candidate got the position. T.322–23.

Between September 1986 and August 1987 LILCO hired, transferred, or promoted over 60 employees. Of those, about 22 were under 40 and about 38 were over 40. Of those over 40, about 22 were younger than Binder, about 6 were older, and about 10 were the same age. Of the positions into which they moved, about 19 were at or above the division manager level, and about 41 were below. Transfers and promotions outnumbered new hires by a 5–to–1 ratio.[8] Binder testified that he was qualified to hold (and would have accepted) substantially all of the positions that were filled by other people, most of whom were younger than he but some of whom were his age or older. T.100–01, 103–04, 107–37, 178–89; Pl.Ex. 5–41, 61; Def.Ex. K–AAA. As shown below, however, most of these positions are irrelevant to our analysis.

Ferraro was one of the people who changed positions. Kelleher spoke with Ferraro around the same time he spoke with Binder, late in 1986. At that time, Kelleher offered Ferraro an opportunity in the budget office. Kelleher felt that the budget position was at a comparable level to Ferraro's staff position, although it reported to a manager rather than to a senior vice president. In addition, the position called for the same skills that Ferraro was using as Cordaro's staff assistant. T.317–19.

Ferraro was involved in a real estate business outside of LILCO, and was not sure that he wanted to take the position that was offered to him. Kelleher testified (and his was the only testimony on this point) that Ferraro objected more to the perceived demotion than he did to the content of the job, and Kelleher felt that Ferraro would not be underemployed and might readjust himself and enjoy the position. T.318–19. Ferraro took the position, but left to pursue his real estate business shortly thereafter. T.317–18.

In addition, several people at LILCO were demoted during this time period. One of them was Ferraro, who reported to a manager rather than a vice president in his new position. Two others, both younger than Binder, were also demoted. One, Ed Argue, was about 48 years old at the time; the other, Vito Elefante, was about 36 years old. None of the three received a pay cut. T.304–07.

### 3. INPO

In May 1986, as part of LILCO's attempt to license Shoreham, the Institute of Nuclear Power Operations (INPO) conducted a corporate evaluation. T.17. In it, INPO recommended that LILCO do more to attract and retain personnel with nuclear power experience. Pl.Ex. 42. Binder had such experience. However, LILCO's response indicated that because of political pressures, Shoreham was in a unique situation and full operation was delayed. Indeed, Shoreham was shut for good only two years later after much struggle. *See* Susan Benkelman, *LILCO Seals the Deal; Shareholders OK pact with state to shut Shoreham,* NEWSDAY, June 29, 1989, at 5.

### 4. LILCO's EEOC Statement

On February 13, 1987, Binder left LILCO for good. He subsequently filed a complaint with the Equal Employment Opportunity Commission (EEOC). In its response to his complaint, LILCO averred that Binder was a lackluster performer whose original transfer

---

8. Those employees for whom a date of birth could not be determined from the evidence were excluded from the foregoing analysis.

to Cordaro's staff was organizationally a demotion. Pl.Ex. 57 at 6. LILCO further stated that Binder was not particularly attuned to meeting deadlines, so a line position, if one had existed that required his knowledge and skills, would not have been offered to him. Pl.Ex. 57 at 7.

In an affidavit submitted in support of LILCO's original motion for summary judgment, Kelleher swore that he never considered age in his decisions. Pl.Ex. 58 at 6. Further, in another affidavit Kelleher swore that it was Binder's "arrogant demeanor" that was a reason for not considering him for a lower-level position. Pl.Ex. 59 at 4–5. In a deposition before trial, Kelleher averred that Binder's personality had nothing to do with LILCO's decision not to offer him a position. T.302–03. Binder claims that these positions are inconsistent among themselves and with LILCO's position at trial.

### III. The Jury's Verdict and the Sufficiency of the Evidence

The jury was discharged at 12:29 p.m., and lunch was brought in for the jurors. In less than two hours, the jury returned with a verdict in Binder's favor of $828,505 for lost wages and $497,738 for pain and suffering, for a total of $1,326,243. It further found that LILCO had acted willfully. T.484–85.

Over Binder's objection, the jury was given a supplemental question asking it to specify the positions it believed were denied to Binder because of his age. The jury returned about an hour later, and the following took place:

THE COURT: Madam Foreperson, would you please stand?

In the matter of supplemental verdict sheet [sic]:

In finding that Donald Binder's age was a determining factor in LILCO's decision to fire him, we find that he was denied employment in violation of ADEA for the following positions at LILCO:

1.

THE FOREPERSON: Well, sir, I have quite a lengthy letter here, if I may read it.

THE COURT: Would you please read it for the record?

THE FOREPERSON: Okay.

The jury found that a policy with respect to transferring employees to differ [sic] positions was not applied evenhandedly. Mr. Kelleher *did not recommend that Mr. Binder apply for* even one vacancy at LILCO. The jury finds because of the preponderance of all the evidence, Mr. Binder was denied access to position opportunities because of his age. There is no doubt if he had been ten years younger with his knowledge and experience a multitude of positions would have been forthcoming.

Refer to plaintiff exhibit 51. The last page has an organization chart under Mullarky. [sic] *It is difficult to evaluate Mr. Binder's suitability to all of these positions,* but it is impossible to believe that at a time when Mr. Kelleher knew that Mr. Binder's position was about to be eliminated that none of the eleven vacancy [sic] engineer positions were suitable for him. *Mr. Kelleher did not recommend to Mr. Binder that he apply for any of these vacancies.*

Refer to plaintiff exhibit 42. It states that 15 of 25 supervisory and engineering positions at the Shoreham Facility are vacant. It is difficult to believe that Mr. Kelleher did not recommend that Mr. Binder apply for any of these vacancies.

Refer to plaintiff exhibit 50 and defense exhibit E. In January of 1987, Mr. Binder met with Mr. Cole and Ms. Mullarky [sic] and was led to believe that he would be transferred into Mullarky's [sic] group for the purpose of writing a project manual with high priority. He was completely surprised that on 2/3/87 he was informed without explanation that he had been terminated. T.490–91 (emphasis added).

The court then sent the jury back out "to attempt to answer the question that is put to [it]." T.492. Less than 15 minutes later, the jury returned with a list of positions:

1. Engineer for manual preparation of the project management control division.

2. Engineer or supervisor, operations department, Shoreham.

3. Supervisor, project administration section, Mullarky [sic].

4. Senior engineer, cost engineering section, Mullarky [sic].

5. Senior engineer, project engineering section, Mullarky [sic].

6. Project engineer, Mullarky [sic].

T.494–95. At sidebar after all the jurors concurred in the verdict as read by the foreperson, Binder's attorney requested that the jury be asked whether the list was exhaustive or merely exemplary. Within five minutes, the jury returned, and the following took place:

THE COURT: Are the positions that you listed, the six positions, . . . all the positions that you find Donald Binder was denied at LILCO because of his age? Yes or no.

THE FOREPERSON: Yes.

THE COURT: Thank you. Juror number 2, is that your verdict?

JUROR NO. 2: No.

THE COURT: That these are all the positions?

JUROR NO. 2: No.

THE COURT: You say no?

THE FOREPERSON: I am sorry.

THE COURT: You say there are other positions?

THE FOREPERSON: No—I am sorry.

THE COURT: Let me give the question again.

THE FOREPERSON: Okay.

THE COURT: Are these all the positions that you found that Mr. Binder was denied because of age?

THE FOREPERSON: Can I read this, sir?

THE COURT: Go ahead.

THE FOREPERSON: The list submitted to you is not exhaustive. This list is representative of the types of vacancies that existed on or about October 1, 1986.

T.498–99. The court then numbered the sixth position, and added lines 7–10, and stated, "If you have addition [sic] positions I will submit a further form. . . . Incidentally, if you don't complete your deliberations tonight you will come back tomorrow and continue. But this question must be answered in full." The jury then retired for further deliberations.

After less than 15 minutes, the jury returned with the four additional lines filled in. The jurors agreed that the ten positions were the only ones Binder was denied because of age. The additional positions were:

7. Schedule analyst, Mullarky [sic].

8. Assistant department manager, electric systems, opns. [operations]

9. Manager, electric power supply division.

10. Nassau protection division engineer, prot. division.

*A. Sufficiency of the evidence to support the verdict*

The jury deliberated for less than two hours (since at least part of the time between 12:29 and 2:35 was devoted to eating lunch) before returning with its verdict. In that time, the jury purportedly assessed the evidence and made determinations about liability, damages, and willfulness. But when asked to clarify its verdict by specifying those jobs Binder was denied because of his age, it took the jury four tries and more time than it needed to reach its original decision to answer the question. T.488, 490–92, 498–99, 501–02. As demonstrated below, the jury's specific answers do not comport with the evidence and its verdict must be set aside.

■ Binder claims that, because Cordaro suggested that he speak with Kelleher, he was relying solely on Kelleher to find him another position in LILCO. He never communicated this belief to Kelleher or to anyone in LILCO. T.320. Kelleher's uncontroverted testimony was that management succession was only for division managers and higher. Binder had been at LILCO for over 30 years, and held positions both below and above the level of division manager. He can be presumed to have known the standard company practice with respect to filling posi-

tions, especially given his testimony about his succession up the ranks. His reliance on Kelleher to find him *any* position, especially since he did not communicate that reliance to Kelleher, was unreasonable. *Cf. Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 401 (2d Cir.) (in light of explicit language of releases of rights under ADEA, plaintiffs could not reasonably have relied on alleged assurances by defendant of non-enforcement), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989); *Malarkey v. Texaco, Inc.*, 983 F.2d 1204, 1213 (2d Cir. 1993) (where company had no formal job posting or application process but rather relied on key employee to recommend promotions, plaintiff not unreasonable in failing to apply for vacant positions).

Binder contends that Kelleher never suggested that he apply for any positions in the company, and that he did not do so because of Binder's age. Because Binder was 57 at the time, he claims, Kelleher recommended only younger candidates for positions that Binder would have taken.

Kelleher testified that it was the practice at LILCO not to underemploy personnel. This policy was an attempt to avoid poor performance and low morale, since employees who were underemployed tended to be unhappy and then quit. T.303–04. Kelleher scrutinized the positions that were not filled by self-nomination; he expected that Binder would check the bulletin boards regularly for positions in which he might be interested. T.323–24. Of the higher-level positions at which Kelleher looked, he determined that none was suitable for Binder given his skills and experience. And given the jury's specific findings, LILCO need not rely on the underemployment rationale. As discussed more fully below, the two jobs at the higher level that the jury specifically found were denied to Binder because of his age were not suitable for him because of what he told Kelleher.

■ There was no testimony at any time from any witness that Binder's age had any bearing on LILCO's decision not to offer him another position. Binder testified that Cordaro never mentioned age to him at all. T.246. Cole testified that age had nothing to do with the lack of a position for Binder in the Project Management department. T.274. Kelleher never mentioned age during his testimony, T.283–327. The fact that early retirement was mentioned as a possibility for Binder is insufficient to inject age as a factor in LILCO's decision. *See Coburn v. Pan American World Airways, Inc.*, 711 F.2d 339, 344 (D.C.Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983); *Franklin v. Greenwood Mills Marketing Co.*, 1983 WL 563, at *12 (S.D.N.Y. Sept. 13, 1983); *Nabat v. Aetna Casualty and Sur. Co.*, No. 92 C 945, 1993 WL 390373, at *3–4 (N.D.Ill. Sept. 30, 1993).

There is no interpretation of the evidence that would allow a reasonable factfinder to conclude that Binder was the victim of age discrimination.

In his opposition memorandum, Binder avers that "[he] also offered proof of a broad array of positions, outside the Project Management Department, in other parts of the company, that were available and filled by younger individuals." Plaintiff's Memorandum of Law in Opposition to Defendant's Post–Trial Motion (Pl.Mem.) at 28. Although the jury's first note talked about "the preponderance of all the evidence," it ultimately found only ten specific positions that Binder had been denied because of his age. Because of this finding, the other positions available in the company at the time are irrelevant to our consideration. The court further notes that there was also evidence that some available positions were filled by people Binder's age or older. T.178–79, 184–87, 194–96; Def.Ex. K, M, SS.

### 1. The burden of production

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court established an allocation of the burden of production in Title VII discrimination cases. The *McDonnell Douglas* formula has also been applied to cases under the ADEA. *St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2757, 125 L.Ed.2d 407 (1993) (Souter, J., dissenting); *Kirschner v. Office*

of the Comptroller of the City of New York, 973 F.2d 88, 91–92 (2d Cir.1992).

■ Under *McDonnell Douglas*, the plaintiff must first make a *prima facie* showing of discrimination. Once it has, a presumption arises that the employer unlawfully discriminated against the employee. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). The burden then shifts to the defendant to produce a legitimate, non-discriminatory explanation of the adverse employment action. *Id.*

■ This shift of the burden of production, however, does not affect the burden of persuasion, which remains on the plaintiff throughout.[9] *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747; *Burdine*, 450 U.S. at 253–55 & nn. 7–8, 10, 101 S.Ct. at 1093–95 & nn. 7–8, 10. Once the defendant has rebutted the presumption by introducing "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action," *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747 (emphasis in original), the presumption drops from the case. *Burdine*, 450 U.S. at 255, n. 10, 101 S.Ct. at 1094, n. 10. At that point, the plaintiff "has 'the full and fair opportunity to demonstrate [...] that the proffered reason was not the true reason for the employment decision,' [*Burdine*, 450 U.S.] at 256 [101 S.Ct. at 1095] ..., *and that [age] was*." *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747 (emphasis added). The plaintiff always retains the burden of proving by a preponderance of the evidence that he was the victim of intentional discrimination. *Id.* —— U.S. at ——– ——, 113 S.Ct. at 2747–48.

*Hicks* stands for the proposition that a jury, even after rejecting an employer's proffered explanation for an adverse employment decision, must have some affirmative evidence of discrimination in order to find for the plaintiff. *See Biggins v. Hazen Paper*

Co., —— F.3d ——, —— 1993 WL 406515, at *5 (1st Cir. Oct. 18, 1993) (on remand from Supreme Court) (plaintiff proved his *prima facie* case, jury disbelieved employer's proffered reasons for discharging plaintiff, *and* "plaintiff met his ultimate burden of persuasion by adducing *additional admissible evidence* of age discrimination.") (emphasis added); *EEOC v. IPMC, Inc.*, 834 F.Supp. 200, 206 (E.D.Mich.1993) (genuine issue of material fact with respect to whether defendant's proffered reasons false not sufficient to withstand summary judgment; plaintiff must also prove genuine issue of material fact regarding whether intentional discrimination occurred); *see also Hicks*, —— U.S. at ——, 113 S.Ct. at 2752 ("the inquiry now turns from the few generalized factors that establish a prima facie case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced."); *id.* —— U.S. at ——, 113 S.Ct. at 2755 ("the *McDonnell Douglas* presumption is a *procedural* device, designed only to establish an order of proof and production.") (emphasis in original); *Lovelace v. Sherwin–Williams Co.*, 681 F.2d 230, 241 n. 12 (4th Cir.1982) ("The contention ... that once the prima facie case has originally been established, the case must of necessity be submitted to the jury .... is simply wrong as a matter of fundamental procedural principle."). In other words, even though his allegations were sufficient to invoke the *McDonnell Douglas* formula, Binder still had to prove each element of his *prima facie* case, in the second sense in which the *Burdine* Court used the term, with some affirmative evidence.

Furthermore, since Binder was clearly within the protected class and adverse action was taken, the important question is one of causation. The evidence on that score, without weighing credibility, is wholly circumstantial. *Cf. Lovelace*, 681 F.2d at 241. Where causation is dispositive, courts have looked for the plaintiff to prove that his

---

**9.** In *Burdine*, the Court differentiated between two uses of the term *"prima facie case"*. In one sense, *prima facie* case means allegations that raise a rebuttable presumption. In the second, more difficult, sense, it refers to "the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue." *Bur-*

*dine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7 (citation omitted). Here, although Binder alleged actions that raised the presumption of age discrimination, he still had to produce sufficient evidence to allow the jury to infer such discrimination.

version is "reasonably probable" rather than merely "possible" in order to guard against the danger that, "in a matter so generally incapable of certain proof jury decision will be on the basis of sheer speculation, ultimately tipped, in view of the impossibility of choosing rationally between mere 'possibilities,' by impermissible but understandable resort to such factors as sympathy and the like." *Id.* at 242.

 To make out a *prima facie* case of age discrimination sufficient to invoke the presumption, Binder must allege that (1) he belongs to the protected class (over 40 years old); (2) he applied for and was qualified for (or was denied the opportunity to compete for) the position(s) sought; (3) he was not hired despite his qualifications; and (4) a younger person ultimately filled the position. *Taggart v. Time Inc.,* 924 F.2d 43, 46 (2d Cir.1991). The fourth criterion is not strictly necessary; it is merely one way of inferring discrimination. *See Dugan v. Martin Marietta Aerospace,* 760 F.2d 397, 399 (2d Cir. 1985) (proof that adverse employment decision made "under circumstances that give rise to an inference of discrimination" sufficient for *prima facie* discharge case).

Initially, LILCO did not challenge Binder's *prima facie* case; rather, it accepted its burden of production and proffered a legitimate, non-discriminatory business reason for not offering Binder any positions: it did not want to underemploy its personnel. (In addition, it relied on Binder to apply for positions below the division manager level.) LILCO's explanation, if it had been accepted by the jury, would have supported a finding that unlawful discrimination did not cause it not to offer Binder a job. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2747.

Once LILCO proffered that explanation, the *McDonnell Douglas* presumption dropped from the case. *Burdine,* 450 U.S. at 255 n. 10, 101 S.Ct. at 1094 n. 10. Binder then had to prove with affirmative evidence each element of his *prima facie* case. *See Flynn,* 836 F.Supp. at 154. In the court's view, he did not do so.

**2. Binder's *prima facie* case**

The underemployment justification would only apply to those positions at or above the level of division manager. Of the ten positions the jury found Binder was refused, only two, numbers 8 and 9, were at that level. Given LILCO's reasonable standard practice, Kelleher would have had nothing to do with the other eight positions that the jury specifically found Binder was denied. With respect to those two positions, therefore, we must examine the evidence Binder adduced to see whether it could support a finding that LILCO's proffered explanation was merely a pretext *for discrimination;* that is, whether there was any evidence that age played a role in LILCO's decision. *See Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093 (plaintiff may prove that defendant's proffered reasons were pretext for discrimination); *Hicks,* —— U.S. at ——, 113 S.Ct. at 2752 ("a reason cannot be proved to be a 'pretext *for discrimination'* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original). We will also examine the other eight positions; a full examination of the jury's specific findings makes it clear that they acted out of compassion and sympathy rather than from the evidence and the law. *See Flynn,* 836 F.Supp. at 164.

(1) Binder clearly established that he was in the protected class. At the time he was told his position was being eliminated, he was 57 years old.

(2) Binder did not apply for any of the posted positions; rather, he relied on Kelleher to tell him about any job suitable for him. Kelleher testified that he assumed that he would look at for positions that were not posted, but that Binder would be checking the bulletin boards and applying for any posted positions in which he was interested. T.323. Binder never told Kelleher that he was relying solely on him to find Binder a new job. T.320.

The jury found it "impossible to believe ... that none of the *eleven* vacancy [sic] positions" in Mullarkey's division was suitable for Binder, and it found that "a policy with respect to transferring employees to differ [sic] positions was not applied even-

handedly. Mr. Kelleher did not recommend that Mr. Binder apply for even one vacancy at LILCO." T.490 (emphasis added).

First, it must be noted that the jury was asked a specific question: What positions was Binder suited for and denied because of age? The jury did not answer that question; indeed, its note said that, with respect to the vacancies in Mullarkey's division, "[i]t is difficult to evaluate Mr. Binder's suitability to all of these positions. . . ." T.491. Rather, it was the jury's *feeling* that it was "impossible to believe" that he was not suited to any of them. The jury only delineated positions when sent back out by the court for further deliberations.

Second, the jury seriously misunderstood the evidence. Plaintiff's Exhibit 51 is part of the long-range plan for the Mullarkey's division of the Project Management department. 27 positions are shown, including the eleven to which the jury referred. Yet the unopposed testimony was that only 17 were authorized or budgeted as of February 1987. T.266–71. There were not eleven positions available, but some number less than that. That the jury referred to the eleven positions, coupled with its other clear errors, shows that the jurors did not understand the evidence.

Further, it was not Kelleher's job to recommend that Binder apply for posted positions. At worst, this was a misunderstanding between them: Binder thought Kelleher was going to look throughout the company, but Kelleher thought that he was just going to look at the higher-level positions that were normally filled by the management succession program. Binder testified that Cordaro told him that seeing Kelleher would be "the best way to explore what is available on the broadest scale"—not the only way. T.190. Presumably, it was the best for those positions at or above division manager; for those positions below that level, self-nomination would have been the best way. As detailed earlier, Binder's reliance on Kelleher for those lower-level positions was unreasonable as a matter of law.

Given the speed with which the jury returned from its "deliberations", the fact that it did not rely on the evidence but rather on its understandable but impermissible compassion is not surprising. *See Unijax, Inc. v. Champion Int'l, Inc.*, 516 F.Supp. 941, 950 (S.D.N.Y.1981), *aff'd*, 683 F.2d 678 (2d Cir. 1982). For the jury to ignore LILCO's standard practice means that it did not require Binder to prove with affirmative evidence the second prong of the test of discrimination under the ADEA. Binder cannot carry his burden of *persuasion* on this issue, and his *prima facie* case fails.

(3) Undoubtedly, Binder was not hired. The only testimony about whether he was qualified to perform the jobs for which he says he should have been considered was his. The jury was entitled to believe him.

We note, however, that Binder also testified that there were certain jobs he would not take regardless of how well qualified he was to perform them, e.g., meter reader. T.202–03. Since the jury heard little or no evidence about the ten positions it listed, it could not have seriously evaluated whether Binder would have accepted them. In addition, it should again be noted that the main reason Binder was not hired for these jobs was that he did not apply for them; LILCO never had the opportunity to evaluate his qualifications.

(4) The jury originally listed six positions as "representative of the types of vacancies that existed on or about October 1, 1986". T.499. None is at the level of division manager or higher. Had Binder not requested clarification (after initially objecting to the supplemental verdict), this would be the end of the analysis—no reasonable factfinder could have found that age played any part in LILCO's decision not to offer any of these jobs to Binder.

### a. The two upper-level positions

▮▮▮ After the jury returned with four additional positions it found Binder was denied because of his age, it still listed only two positions, number 8, assistant department manager, electric systems, operations, and number 9, manager, electric power supply division, at the appropriate level. The men who filled these positions were older than 40, although both were younger than Binder, one

by about 13 years and the other by about 17 years.

Binder testified that he told Kelleher the areas in which he would have been interested—project management, co-generation, refuse recovery, nuclear, engineering, and new business. None of them was in the electric power supply area. Binder had had no experience in his 31 years at LILCO in the electrical area. Pl.Ex. 1. For Kelleher not to have recommended Binder for these positions was merely to heed Binder's preferences and experience. The verdict with respect to these positions is impeached with Binder's own testimony.

The court notes at this point that LILCO's underemployment rationale was offered in the context of the *McDonnell Douglas* burden-shifting framework. Since these positions were outside Binder's professed areas of preference, and since there was no testimony as to whether he was qualified to hold either of these positions, it is not LILCO's failure to disprove pretext that mandates the court's current action. Rather, in light of the jury's verdict it is the failure of Binder to prove his *prima facie* case.

### b. The eight lower-level positions

██ All of the other positions, i.e., 1–7 and 10, were positions that were filled by posting or by help wanted advertisements. Binder admittedly did not apply for any of them. LILCO cannot be held responsible for age discrimination if one of the prerequisites—that is, that Binder applied for and was turned down for a job for which application is the method of filling it—is missing. That is the case here.

Binder argues that, because LILCO did not want to underemploy its personnel, any attempt to apply for positions off the bulletin board would have been futile. He cites *Malarkey* in support of this contention. In *Malarkey*, however, there was no job posting or application system; all jobs were filled by the recommendation of one key employee. Binder argues from hindsight: given what LILCO has testified to, he contends that any self-nomination would have been in vain. Yet since LILCO had a process for self-

nomination in place, that conclusion is not supportable by the evidence.

In addition, Binder points to the fact that, in March 1987 and thereafter, additional personnel were hired into the Project Management Department pursuant to its long-range plan. He concludes that those positions should have been approved for him to fill in January or February 1987. Yet it was uncontroverted that Catacosinos had the final word on approving positions before they were to have been staffed. His denial of Cole's request to authorize a position for Binder in February 1987 was not based on age. *Binder I,* 933 F.2d at 192.

Further, any reliance on other positions that were approved and filled after Binder left LILCO is misplaced. At the time Binder left LILCO, the positions did not exist anywhere but in a long-range plan for the Project Management department. Even if Cole planned to request authorization in the future, can Binder really contend that LILCO should have kept him around on the chance that he would accept a demotion into a new position—even when the authorization, although anticipated, was subject to Catacosinos' veto? That stretches the bounds of reason too far.

As has been noted before, all eight positions were below the level of division manager and would have been filled by the posting process (or by outside hiring). The fact that Binder did not apply means that LILCO never had the opportunity to discriminate against him; he was never in the running. *Cf. Taggart,* 924 F.2d at 46–47 (Taggart *applied* for scores of jobs, which were filled with younger candidates). Even if the jury rejected Kelleher's testimony on this score, however, there was no evidence that would allow them to infer that *age* was the reason Kelleher did not recommend that Binder apply for the positions.

██ In addition, the overqualification analysis does not factor into an analysis of these eight positions. Although finding an employee "overqualified" can be a pretext for discrimination, *see Taggart,* 924 F.2d at 46, there must be a comparison of the requirements of the position with the employee's background in order to arrive at that deter-

mination. Here, that comparison never happened because Binder never applied for these positions, and Kelleher did not consider him for them.

1. "Engineer for manual preparation of the project management control division." This is the position that was *never created*, not even during the second phase of staffing in 1987. There was never any such position at LILCO. It does not appear on the long-range organizational chart in Pl.Ex. 51. Even if the jury somehow thought that this position was staffed at some later date, there was no evidence in the record that it was staffed by a younger person. (Ironically, in Binder's affidavit opposing summary judgment in this case, he states that Philip Simoni, an employee about a month *older* than he, was transferred to the Project Management department to do work that included a procedural manual. Memorandum of Decision and Order at 12, *Binder v. LILCO*, No. CV 88–1315, 1990 WL 137403 (E.D.N.Y. July 26, 1990).) No reasonable jury could have found on the evidence that Binder was denied this position because of his age.

This is underscored by the last paragraph of the jury's letter. "In January of 1987, Mr. Binder met with Mr. Cole and Ms. Mullarky [sic] and was led to believe that he would be transferred into Mullarky's [sic] group for the purpose of writing a project manual with high priority. He was completely surprised that on 2/3/87 he was informed without explanation that he had been terminated." T.491. Even if LILCO could be said to have misled Binder by leading him to believe that he was definitely going to be moved into this position, age had nothing to do with its decision not to create the position. The evidence was uncontroverted that Catacosinos had the final say as to whether to create the position. He refused to do so. His refusal had nothing to do with the age—nor indeed with the identity—of the person slated to fill it. T.267.[10]

2. "Engineer or supervisor, operations department, Shoreham." In its first note, the jury said, "Refer to plaintiff exhibit 42. It states that 15 of 25 supervisory and engineering positions at the Shoreham Facility are vacant. It is difficult to believe that Mr. Kelleher did not recommend that Mr. Binder apply for any of these vacancies." First of all, the jury listed only one position in the supplemental verdict. Second, even if this one position can be read as encompassing all 15 vacancies, there was no evidence in the record about the employees who subsequently filled these positions. Binder cannot support a claim of age discrimination without a showing that those selected to fill these positions were younger than he, something he did not do. *Taggart*, 924 F.2d at 46.[11]

3. "Supervisor, project administration section, Mullarky"; 5. "Senior engineer, project engineering section, Mullarky"; 7. "Schedule analyst, Mullarky."

There is no evidence in the record as to who ultimately filled these three positions—if indeed they were ultimately authorized. Although Mullarkey and Cole requested them, T.272–73, Pl.Ex. 55–56, there is no evidence that the request was approved by Catacosinos. Once again, these positions appeared only on the five-year planning chart in Exhibit 51. This chart did not reflect budgeted positions in Mullarkey's division as of October 1986; it rather reflected what Mullarkey and Cole wanted the division to look like after all personnel were on board. Without evidence that these positions were ultimately authorized, there can be no reasonable finding that Binder was denied the positions because of his age. Likewise, without evidence that, if authorized, the positions were filled with younger workers, the jury's verdict cannot stand.

4. "Senior engineer, cost engineering section, Mullarky". Sik C. Seto took this position on March 1, 1987. Seto was born in 1943, and was about 14 years younger than

---

10. In *Binder I*, even though the Second Circuit reversed this court's grant of summary judgment for LILCO, it agreed that LILCO's refusal to created this position was not based on age. 933 F.2d at 192. The jury had no evidence on which to base its conclusion with respect to this position.

11. And again, this position was filled by the posting process, which has already been discussed.

Binder. This position was filled after Binder left LILCO, and is therefore subject to the relevant analysis above. In addition, it must be stressed that this was a posted position. Seto had been with LILCO since 1984, and presumably nominated himself for this position. Binder could have done the same; to ascribe his failure to do so to some discriminatory motive on LILCO's part is not supported by the evidence, and could only have been the result of "surmise and conjecture."

6. "Project engineer, Mullarky". John Chiesa filled this position; he answered an ad in the newspaper in September 1987 and was hired in November 1987. He was about 27 years younger than Binder. This position, however, was clearly part of the additional complement requested in Mullarkey's and Cole's May 29, 1987 memos. Pl.Ex. 55–56. It did not exist at the time Binder was separated from LILCO. There was no such position with respect to which Binder could have been discriminated against because of his age. Once again, this specific finding undercuts the jury's general verdict and indicates that the latter was the result of sympathy.

10. "Nassau protection division engineer, prot. division". This position was filled by Timothy True effective September 1, 1986. True was about 24 years younger than Binder. Any doubt that the jury's verdict was the result of sympathy and compassion will be eradicated upon closer examination of this finding. True took his position on September 1, 1986. The announcement was made on August 25, 1986. Pl.Ex. 61. Binder was told that his position was being eliminated at the end of September. T.77, 211–12. In other words, the jury found that Binder was denied this position because of his age, despite the fact that the position was filled at a time before Binder was looking for a job![12] See Pl.Mem. at 28 n. 21. No reasonable trier of fact could have reached this conclusion. The inescapable inference is that the jury relied on its compassion for Binder rather than on the evidence presented to it.

### 3. Ferraro's position

The jury in its letter alluded to the fact that Ferraro was offered a position when it was eliminated. ("There is no doubt if he [Binder] had been ten years younger with his knowledge and experience a multitude of positions would have been forthcoming.") First of all, Kelleher explained why he offered Ferraro that position—the *responsibilities* were commensurate with those he was performing for Cordaro, even though it reported to a division manager rather than a vice president. T.318–19. Second of all, even if the jury disbelieved Kelleher's explanation, there was no testimony that Binder was ever considered for that position, or that he was qualified to take it. In fact, the jury did not list the position Ferraro was moved into as one that was denied to Binder because of his age. Ferraro and Binder had different skills, and Binder was not able to say that he could have performed satisfactorily in the position Ferraro was offered. The mere fact that LILCO offered a budgeted position to a man with significantly different skills who happened to be younger, without more of a nexus between his being offered a job *because* of his age (or between Binder's not being offered a job and *his* age), is insufficient to prove a claim of age discrimination. *See, e.g., Taggart,* 924 F.2d at 46–47; *cf. Nabat.*

Binder makes much of the fact that Kelleher "offered [Ferraro] non-specific opportunities in Underground Lines, which Ferrara [sic] rejected . . .", but did not offer Binder anything. Pl.Mem. at 32. The testimony is somewhat different. Kelleher testified that, "Mr. Ferrara [sic] came out of our underground lines organization. And I asked him if he was interested in going back to that. And he said no. And I mentioned to him . . . that there was this opportunity at the budget office which was at a somewhat comparable level to the one he was at." T.317.

Kelleher did not offer Ferraro a "non-specific opportunity"—he was exploring options, *the same way he did with Binder:*

---

12. Indeed, Binder specifically testified that he did not look for a job in LILCO prior to his initial conversation with Dr. Cordaro. T.182–84.

... we first talked of the possibility of whether he would pursue an outside interest or career, start a business. But short of that, if he decided not to do that, what positions potentially he would be interested in or thought he would be interested in within the company.

The two particular positions that I can recall being referred to was the department manager of what was then called the new business department, and I think the phrase he may have used was any department manager position in the office of engineering. T.292.

Kelleher did not treat Binder any differently than he treated Ferraro. Ferraro was offered the position he eventually took because the work was closely related to the work he was doing for Cordaro. T.318.

### 4. Inconsistencies in LILCO's stories

■ Binder also stresses the fact that LILCO was "caught" in inconsistencies among: its employees' trial testimony; its responses to interrogatories; deposition testimony; and its EEOC position letter. Pl. Mem. at 34–40. As noted before, however, the fact that LILCO may have prevaricated with respect to its true reasons for not offering Binder a position cannot by itself give rise to an inference of discrimination. *Hicks,* — U.S. at ——– ——, 113 S.Ct. at 2752–53; *see also United States Postal Service Bd. Of Governors v. Aikens,* 460 U.S. 711, 714–15, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983). As the *Hicks* Court stated, "Title VII is not a cause of action for perjury...." *Hicks,* — U.S. at ——, 113 S.Ct. at 2754. Neither is the ADEA. "[A] ... plaintiff does not necessarily meet its burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence." *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 142 (2d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). As demonstrated above, Binder has not adduced evidence from which a reasonable factfinder could infer that LILCO discriminated against him because of his age. "The fairness or

wisdom of management's policies are not for courts to decide.... Rather, the issue thus narrowed at this point in the division of evidentiary burdens is whether defendant's reasons are the *pretext for discrimination.*" *Franklin,* 1983 WL 563, at *11.

### 5. Summary

In sum, the court finds that "there is such a complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture." *Lambert,* 10 F.3d at 56. The evidence adduced at trial is insufficient as a matter of law to sustain a verdict for Binder. With no affirmative evidence of discrimination, Binder relied on misdirection and suspicion to raise the specter of age discrimination. Yet there must be more than disbelief and misgivings about LILCO's story coupled with sympathy and compassion for Binder to win the case for him. He must present evidence that age was a factor in LILCO's decision, and that he has not done.

### IV. Motion for a new trial

■ Even if the court did not grant LILCO's motion for judgment as a matter of law, it would certainly grant LILCO's motion for a new trial pursuant to Fed.R.Civ.P. 59. Contrary to Binder's assertion in his papers, the fact that "[t]his Court provided LILCO with a fair trial" is beside the point. "A District Court should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Pl. Mem. at 46 (*quoting Smith v. Lightning Bolt,* 861 F:2d at 370). Because the court is convinced that the jury has indeed reached a seriously erroneous result, it would grant the motion for a new trial. *See also Hygh v. Jacobs,* 961 F.2d 359, 365 (2d Cir.1992).

There is a complete lack of evidence to support Binder's contention that age played a part in LILCO's not offering him another position. The evidence rather supports LILCO's contention that the decisions it made were fair and were not based on Binder's age. They may not have been wise business decisions, but that is not part of a

claim under the ADEA. Further, the jury's fumbling when trying to specify positions it found Binder was denied because of his age indicate that its initial verdict was based more on sympathy and compassion than on the evidence. *See Unijax,* 516 F.Supp. at 950 ("neutral principles of law" must be protected, in this case by granting Rule 50 motion, "from powerful forces outside the scope of the law—compassion and prejudice."). For all the above reasons, the court grants LILCO's motions for judgment as a matter of law and for a new trial.[13]

## V. New trial on damages

■ Even if it were not granting LILCO's motions under Rules 50 and 59, the court would grant LILCO a new trial on the issue of damages. FED.R.CIV.P. 59(d). Again, the jury engaged in speculation beyond its province.[14]

### A. Lost wages

The jury awarded Binder $828,505 in compensatory damages. Yet Binder only put before the jury evidence of $552,337 lost wages, pension benefits, and raises (net of pension benefits received and money earned by Binder as a consultant), to the calculation of which LILCO stipulated. T.436. That is, the jury awarded Binder more than even he said would compensate him for his out-of-pocket loss.

Binder asks the court to take judicial notice of a formula for compound interest, $(1+i)^n$, where "i" equals the interest rate and "n" equals the number of years over which to compound. Inserting 7% (.07) for "n" and 6 years (1987–1993) for "n" and multiplying the rounded-off result by $552,337 yields $828,505, the amount the jury awarded.

■ The court will take notice of the formula. FED.R.CIV.P. 201. The court will also note, however, that the jury not only awarded Binder interest, it decided at what rate and for what period. The court's instructions on damages were quite clear:

In this case, if you have found defendant is liable to plaintiff under ADEA, he may prove and recover damages consisting of deprived wages and the losses he sustained as a result of being excluded from any bonuses, pension or other lost fringe benefits, from the date of violation to the present. In other words, plaintiff can recover damages based on compensation by way of salary, bonuses, pension and other fringe benefits from the date of discharge to date. T.467.

There was no mention of interest at all in the Charge of the Court, of which each juror had a copy. The fact that the jury awarded interest—and decided at what rate to award it—indicates that the jury did not follow the court's instructions, but rather was so sympathetic to Binder that it took every conceivable opportunity, whether within or without its province, to award him whatever it possibly could.

While the court takes judicial notice of the compounding formula, it is far from clear that the jury actually used it. We engage in mere speculation in saying that the jury awarded interest. Indeed, the interest calculation actually results in a figure of $828,908.90, which is $(1.07)^6*\$552,337$. The jury could just as easily have determined that Binder was not asking for enough money, and multiplied everything he put forward by 1.5. Or, it could have neglected to net out (or done so incorrectly) the pension benefits Binder received and his salary through 1993. The gross loss was $839,698, which is only about $9,000 away from the amount the jury actually arrived at. Or, it could have picked a number out of thin air. While the last is unlikely, it is far from clear that the jury engaged in the concededly (Pl.Mem. at 51) impermissible interest calculation above. Consequently, because the jury's award is not supported by the evidence, the court would award a new trial on damages.

### B. Pain and Suffering

■ Damages for pain and suffering are compensatory, not exemplary, in nature.

---

13. Of course, this finding also requires that the jury's determination that LILCO acted willfully be set aside. With no discrimination, there could have been no willfulness.

14. The jury's insupportable damage award reinforces the conclusion that its verdict did not comport with the evidence.

There must therefore be some evidence of the magnitude of the injury to ensure that the award is not punitive. *New York City Transit Authority v. State Div. of Human Rights,* 78 N.Y.2d 207, 573 N.Y.S.2d 49, 54, 577 N.E.2d 40, 45 (1991); 36 NY Jur.2d *Damages* § 64 (1984) ("The amount allowed [for pain and suffering] must be fair, free from sentimental or fanciful standards, and based on the facts disclosed.").

Binder's testimony about his emotional damages was this:

> Well, it was difficult to get started. And it took longer than I wanted to. There was no transition. There was no lead in. It was like taking a cold shower, only much worse. And, of course, the rejection from the offers that I had—or the solicitation or the job hunting I did was not encouraging.
>
> So, I decided to go on my own and it meant knocking on doors and the like....
>
> Well, the emotional distress was my inability to support my family....
>
> Obviously, I had no income. And I couldn't make ends meet. And it was very difficult to pay my bills. And I had to take a lot of loans out. I had a lot of early—early on I had a lot of dental work I had to do, because I found out I needed extensive dental work. And I was forced to go to a clinic at $6,000 worth of dental work done at Boothe Memorial Hospital in a clinic. I wasn't happy about that.
>
> I had a daughter entering college. I had obligations to my former wife that I was unable to make.
>
> So, the sum and substance of it was that I was completely alone, having nothing to really work with.
>
> I resented the fact that I was pushed out the door, no transition, no support to help me get started, no secretarial services, none of the niceties of what is common practice in the industry, at least today. So, it just took me far longer to get on my feet. T.170–71.

Based solely on this testimony, the jury awarded Binder $497,738 for pain and suffering.

■ Under New York law, Binder is entitled to an award of money damages for pain and suffering. However, the jury's award of almost $500,000 based on the above testimony is grossly excessive. *See, e.g., Cosmos Forms, Ltd. v. State Div. of Human Rights,* 150 A.D.2d 442, 541 N.Y.S.2d 50 (2d Dep't 1989) (award of $35,000 because plaintiff "emotionally and physically screwed up" reduced to $5,000); *Board of Educ. of the Ravena–Coeymans–Selkirk Cent. School Dist. v. State Div. of Human Rights,* 109 A.D.2d 988, 486 N.Y.S.2d 469 (3d Dep't 1985) (award of $10,000 based on testimony of upset, difficulty sleeping, and migraine headaches reduced to $5,000).

The fact that the jury reached the very precise amount of $497,738 calls the basis of the award into question. The number looks to be the result of specific calculation; yet the jury had no evidence on which to base such a calculation. This award, too, must be set aside, and a new trial is awarded on the issue of compensatory damages for pain and suffering.

In the alternative, the court orders that the award of damages for pain and suffering be remitted to $5,000.

## VI. CONCLUSION

LILCO's motions for judgment as a matter of law and for a new trial is GRANTED. Furthermore, the court on its own motion alternatively GRANTS a new trial on the issue of damages. The jury's verdict is hereby set aside in its entirety. The Clerk of the Court is directed to enter judgment in favor of LILCO and to dismiss the complaint with prejudice, and it is

SO ORDERED.